## Commercial Banking & Trust Company, et al. v. Citizens Trust & Guaranty Company of West Virginia.

(Decided May 6, 1913.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Banks—Organization and Powers.—Banks can lawfully be organized and authorized to conduct business, in this State, only upon the terms and conditions and subject to the limitations prescribed by the banking laws.

2. Banks—Construction .of Charter and Banking Laws.—The enumeration, in the banking laws, of the .powers of banks excludes all other methods of banking.

3. Banks—Implied Powers—Public Policy—Deposits.—A bank has no implied power to secure, by pledge of its assets, the deposits of one of its depositors to the exclusion and detriment of the others. Public policy will not tolerate such practice which, in the event of financial trouble, would enable a bank to protect the favored few at the expense of the equally deserving many.

4. Banks—Banking Laws—Construction—Intent.—The banking laws were contemplated, and framed to insure, fair and uniform dealings by banks with all of their depositors.

5. Banks—Implied Powers.—To enable a bank to exercise a power, not expressly given it by charter or statute, it should be clearly established that such power is necessary to enable it properly, to enjoy, use, and carry out its express powers.

6. Statutes—Construction.—Where a statute is susceptible of a dual construction, one of which secures equality and equity and the other leads to fraud, that construction insuring fair dealing will be adopted.

7. Banks—Deposits—Guaranty.—Where by statute a bank is required to secure a public, or other, deposit before it can receive it, the bank may give such security for its safekeeping and re-payment as does not involve a pledge of its assets.

8. Banks—Securities—Pledge—Ultra Vires Acts.—Under a statute conferring on banks "such powers as may be necessary to carry on the business of banking by discounting and negotiating notes, drafts, bills of exchange, and other evidences of debt," the act of a bank, in pledging its liquid assets to secure the deposits of a county treasurer, was ultra vires and void.

HERMAN D. NEWCOMB, HINES & NORMAN and ARTHUR B. BENSINGER for appellants.

WEHLE & WEHLE and HELM & HELM for appellee.

OPINION OF THE COURT BY JUDGE LASSING.—Reversing.

The Commercial Bank & Trust Company, a corporation, was organized under the laws of this State and empowered to do a general banking and trust business in Louisville, Kentucky. Lloyd W. Gates. is, and was in January, 1912, the treasurer of Jefferson County. As such he was required to give bond for the faithful performance of his duties. This he did, with the Citizens Trust & Guaranty Company, a West Virginia corporation, as surety. The Commercial Bank & Trust Company, desiring to secure, at least, a part of the deposits of the county treasurer, entered into an agreement with him, whereby it obligated itself to furnish said treasurer security, in the sum of $100,000, to secure the safety of any and all deposits·which he might, as treasurer, make in said bank. The Citizens Trust & Guaranty Company likewise became the surety for said bank on said bond to the treasurer, but, before doing so, exacted of said bank a pledge of its liquid assets, in the sum of $100,000, to secure it against loss. The bond of the bank to Gates, treasurer, was duly executed, with the West Virginia corporation as surety, and the bank pledged with said surety certificates of deposit and short term negotiable notes to the amount of $100,000. Under the arrangement

between the bank and its surety, as these notes matured and were paid off or renewed, other paper, of like value, was substituted for that so paid or renewed. In this way the business continued from the time the arrangement was entered into up until January 13, 1913, when the bank was closed on the order, or on the suggestion, of the Banking Commissioner. At that time, the value of the commercial paper claimed by the Citizens Trust & Guaranty Company as security for its liability on the treasurer's bond, amounted to something like $70,000. All of this paper was held by the Louisville National Banking Company, under an arrangement entered into between the Commercial Bank & Trust Company and the Citizens Trust & Guaranty Company. As a question was raised as to who was entitled to the possession thereof, the Louisville National Banking Company would not permit either to have it. Thereupon the Citizens Trust & Guaranty Company filed suit against the Louisville National Banking Company, the Commercial Bank & Trust Company and Thomas J. Smith, Banking Commissioner, in charge of said Commercial Bank & Trust Company, in which it sought to have the said negotiable paper, so held by the Louisville National Banking Company, adjudged to it, and prayed for a mandatory order directing said Louisville National Banking Company to surrender up and turn over to it all of said paper, it being alleged that it was liable on this bond of the bank to Gates, the treasurer, in a sum in excess of the value of the paper so deposited with the Louisville National Banking Company.

The Louisville National Banking Company answered, setting out fully the circumstances under which the said paper was placed in its possession; alleged that it had no interest therein further than a reasonable charge for its services in taking care of it; asked that the West Virginia corporation and the Commercial Bank & Trust Company, in the hands of the Banking Commissioner, be required to litigate the matter of ownership; and stated that it was ready and willing to deliver said notes to whomsoever the court should direct. The Banking Commissioner, Thomas J. Smith, answered for the defendant, the Commercial Bank & Trust Company, and, in addition to traversing the allegations of the petition, pleaded that the paper held by the Louisville National Banking Company was the property, and part of the assets, of the Commercial Bank & Trust Company; that, by virtue of his office, he was entitled to its possession; that the al-

leged agreement, by which it was turned over to and held by the Louisville National Banking Company, as bailee, or custodian, was made by the parties in contemplation of the insolvency of the Commercial Bank & Trust Company, and with the view of preferring the West Virginia corporation over and to the exclusion of the other creditors of the Commercial Bank & Trust Company; and that, by reason of such fact, the attempted transfer was illegal, null, void, and of no effect. Other defenses were interposed, but, for the purposes of this case, they need not be considered. The affirmative matter in the answer of the Banking Commissioner was traversed. Upon the issue thus made the case was submitted to the chancellor for judgment upon the motion of the plaintiff, for a temporary mandatory injunction, and of the defendant, the Banking Commissioner, for a temporary injunction on his answer, which was made a cross-petition against his co-defendant, the Louisville National Banking Company.

Upon consideration, the chancellor was of opinion that plaintiff was entitled to the relief sought, and so adjudged. The motion of the Banking Commissioner was denied. Thereupon, the parties entered into the following agreement:

"It is hereby agreed between plaintiff, Citizens Trust & Guaranty Company of West Virginia, and the defendants, Commercial Bank & Trust Company and Thomas J. Smith, Banking Commissioner, and the Louisville National Banking Company, that on all issues raised between the plaintiff and these defendants the proof in the form of affidavits and exhibits and the pleadings of all parties filed herein, so far as uncontradicted, and the testimony heard by the court, and the cross-examination of affiants shall be treated and considered to be the formal and final testimony offered by said parties as between themselves, and to have the same force and effect as though such testimony was taken by deposition on notice and regularly filed herein; and these parties waive the setting of the case at rules and hereby agree to submit forthwith for final judgment, reserving and excepting for further consideration of the court any issues that are or may be raised as between the other parties hereto and the Louisville National Banking Company, concerning the allowance charges, fees and expenses claimed by the Louisville National Banking Company."

The court, having considered the case, entered the following judgment:

"1. The cross-petition of the defendants, Commercial Bank & Trust Company and Thomas J. Smith, Banking Commissioner, praying for an injunction herein be and it is dismissed, to which said defendants except.

"2. The prayer of the petition of the plaintiff, Citizens Trust & Guaranty Company of West Virginia, for injunction herein is granted and it is now considered ordered and adjudged that the Louisville National Banking Company be and is hereby enjoined from withholding the possession from the plaintiff and is ordered to restore and give possession to the plaintiff herein of all the notes and proceeds of notes described in exhibit 'B' filed with the petition, with the exception of $200 which is reserved for the costs and expenses, if any, of the defendant, Louisville National Banking Company, and it is further adjudged that the plaintiff has the right of possession of said notes and proceeds thereof, except as mentioned above, and the defendants, and each of them, and all persons claiming by or under either of them, are enjoined and restrained from interfering with the plaintiff in the exercise of its rights and powers as pledgee to collect the said notes and to hold and use their proceeds for its indemnity, security and protection, as surety of the defendant, Commercial Bank & Trust Company, upon its bond to L. W. Gates, Treasurer of Jefferson County, Kentucky, and so soon as the sum realized from said collateral shall have amounted to sufficient to reimburse the said Citizens Trust & Guaranty Company of West Virginia, for any loss or expense it may have incurred or been called upon to meet, the balance of said collateral or the balance of the sum realized therefrom shall be paid to the said Commercial Bank & Trust Company, or its representatives.

"Provided, however, that this order shall not be operative until March 24, 1913, the intervening period being allowed to the defendants, and each of them, for the purpose of an appeal from this order, if so desired, and it is ordered that the status existing before the rendition of this judgment shall be maintained during said period unless the question is sooner decided by the Court of Appeals.

"Jurisdiction of this action is retained for the purpose of considering the claim of the Louisville National

Banking Company for expenses and commissions and such other issues as may be presented to the court.''

Later said judgment was modified as follows:

''Came the parties by counsel and the court being advised, it is ordered that so much of the judgment rendered herein on March 3, 1913, granting an injunction to plaintiff as provides that said judgment shall not be operative until March 23, 1913, be and it is hereby set aside.

''The defendants, Commercial Bank & Trust Company and Thomas J. Smith, State Banking Commissioner, pray an appeal from said judgment of March 3, 1913, as modified by this order which is granted. It is further ordered that the injunction granted to plaintiff herein be suspended until March 24, 1913, and that the status existing before the rendition of said judgment shall be maintained during said period unless said appeal is sooner decided by the Court of Appeals.''

The correctness of this judgment is now before us for review.

Many questions were raised and discussed by counsel in oral argument and also in brief, but, from the conclusion which we have reached, it becomes necessary to consider only one, to-wit: The right or power of the bank to pledge its assets to secure the deposit of Gates, County Treasurer, at the expense, and to the detriment, of its other depositors.

Banks can only be lawfully organized and authorized to conduct business in Kentucky as provided by the banking laws. (Art. II, chap. 32, Kentucky Statutes). Section 577, Kentucky Statutes, provides that banks may do business ''upon the terms and conditions, and subject to the liabilities prescribed in this article.'' This is an express limitation upon the authority granted. The following powers are conferred on banks by section 579, viz:

''To adopt and use a corporate seal; to make contracts; sue and be sued; to appoint, remove and elect officers, define their duties, and require from any of them a bond for the faithful discharge of their duties; to prescribe by its board of directors, by-laws for the government of the bank not inconsistent with law; to exercise, subject to law, such powers as may be necessary to carry on the business of banking by discounting and negotiating notes, drafts, bills of exchange, and other evidences of debt, and purchasing bonds, receiving deposits, and allowing interest thereon, buying and selling exchange,

coin and bullion, and lending money on personal or real security as provided in this article.''

This section of the statute limits and defines the business of the bank, and directs that it may be carried on by doing the things specifically enumerated. The enumeration of these powers excludes other methods of banking. The legislature seems to have been especially careful to define the power of banks, and to have been unwilling that these corporations should be allowed to do business, without definite limitations. The officials of one bank might deem it possessed of other and more extraordinary powers than would those of another bank. It was unquestionably the intention of the legislature to define and limit their powers by law, so that all banks should conduct their legitimate business in the same manner, and that the public, dealing with them, might know the power they possessed. So careful were the law-makers in this respect that they even enumerated the right to take bonds from officials, to appoint and discharge them, which power would seem to be inherent in all corporations. It will be observed that section 579, in enumerating the powers of a bank, specifies ''receiving deposits and allowing interest thereon.'' From the earliest times banks, under the common law, have been accustomed to receive deposits. This has been understood to be one of their legitimate functions, but the payment of interest on deposits is a modern custom, which has grown up under the sharp competition existing between banks. Section 579 legalized this custom of paying interest. Without this provision it would manifestly be unlawful under any circumstances, where the powers of banks are defined either by special charter or under general law. Consequently, the law-makers conferred upon banks the power to pay interest on deposits; hence, it is lawful in Kentucky to do so. It is a dangerous power, and may be used in more ways than one to wreck a bank, but, when prudently and legitimately used, it may, and no doubt does, benefit the stockholders. This right to pay interest, however, is as far as the law-makers apparently felt it safe to go.

In this case, the bank has exceeded its express power and, under the claim of the exercise of an implied power, has attempted to secure the payment of a depositor by the pledging of its assets. This is clearly an act ultra vires and unlawful. No such power has been conferred upon banks in this State, nor should authority to do so be granted anywhere. Section 579 grants only such pow-

ers "as may be necessary to carry on the business of banking" by doing the things enumerated. In the matter of deposits and paying interest thereon, whatever power is necessary was granted. The deposit creates a debt, and the assumpsit of the bank to pay that debt is implied by law. The payment of interest is a matter of private contract, which the bank is authorized to make with the depositor. The assumpsit to pay the deposit and the special agreement to pay the interest are therefore both necessary. But there is no implication from the powers granted, and certainly it cannot be said to be necessary, in order to receive deposits and pay interest thereon, that the bank should secure, by pledge of its personal assets or mortgage of its real estate, the debt of its depositor or the interest that it has promised to pay. The powers conferred upon banks are required, by section 577, to be exercised upon the terms and conditions provided in article II, which includes section 579. Therefore, when deposits are received, the bank becomes a debtor to the depositor for the amount of the deposit, and, if it agrees to pay interest, for that also. These are the only terms and conditions regulating deposits and the payment of interest, and if, in addition to this, the bank may pledge its assets to the depositor, then it may exercise another most extraordinary power, which is not conferred by article II and not necessary for the conduct of its business of "receiving deposits and paying interest thereon." It would be a dangerous inplication to deduce from the words of the statute, which should rather by construed strictly, for the benefit of the stockholders and protection of the depositors. The exercise of such a power is, therefore, clearly beyond the terms of the law, or any reasonable or necessary implication which the court would be authorized to deduce from the language of the statute, and would tend to lessen the usefulness of banks as great public institutions, by destroying public confidence in them. Such a practice, if indulged and authorized, might work great injustice and inflict financial loss, not only upon the depositors, but upon the stockholders as well. Large depositors, if secured, might absorb the greater part of the assets of the bank and inflict loss upon unsecured depositors and financial ruin upon innocent stockholders under the double liability law. The law contemplates, and was evidently framed to insure, fair and uniform dealings by the banks with all of their depositors. A secret pledge to secure one, while

others are left without security, although it may be without specific intent to defraud, would nevertheless, in case of loss, justify such an inference. Public policy will not, therefore, tolerate a practice which might, sooner or later, in the event of financial trouble with the bank, enable .it to pay and protect the favored few at the expense of the equally deserving many. If the fact was known that a bank had secured some one or more of its depositors and left the others unsecured, no prudent person would deposit with it. No bank would advertise that it engaged in such a practice, because depositors, who were not provided for, would be driven away. The very fact that the transaction is one that will not stand the test of publicity is a strong argument against its legality, as well as its necessity. Banks publish statements of their assets, and individuals deposit on the faith of these published statements. It is well known that good statements as to assets induce people to deposit their money in banks making such statements. It would be a crowning act of injustice to hold that deposits, thus induced, are nevertheless cut off from sharing in these assets, until some unknown favored few, who have been secretly secured, are satisfied; and it would be a palpable fraud on the part of a bank thus to procure deposits, when its assets were secretly pledged.

The cases of Citizens Life Insurance Co. v. Owensboro Savings Bank & Trust Company's Receiver, 146 Ky., 118; Citizens Bank v. Bank of Waddy, 126 Ky., 169, and State National Bank v. Commonwealth, 129 Ky., 637, are cited and relied upon as supporting inferentially the right of a bank to pledge its assets to secure a depositor. None of the opinions so holds, and in none of these cases was this question involved. In the case of Citizens Life Insurance Co. v. Owensboro Savings Bank & Trust Company's Receiver the question might have been raised, but it was not; nor was it discussed or considered; and there is nothing in that opinion justifying the claim that said opinion is an authority in support of the claim that a bank is authorized to pledge its assets to secure one of its depositors, to the exclusion, detriment and injury of the others.

In Citizens Bank v. Bank of Waddy, the question involved was the right or power of the bank to borrow money and pledge its assets to secure same. This right was upheld. No question of the right of a bank to secure depositors, by pledge of its assets, was involved, and that,

case cannot be said to support the proposition that a bank has such authority. The authority to borrow money and pledge the bank's assets therefor is not at all analagous to its power to pledge its assets in order to secure deposits. In the conduct of its business it may become, and frequently is, necessary for a bank to convert its commercial paper into cash, and, where it cannot do so conveniently or advantageously, by rediscounting it, the bank, with perfect propriety, may borrow money upon the security of its assets; and this right is everywhere recognized as one of the implied powers which a bank has, and may exercise, where no direct authority, authorizing it to borrow money, is given.

In the case of the State National Bank v. Commonwealth, the only question involved was the liability of the bank to the Commonwaelth, under its bond, for the interest on its daily balances. It was held that the accrued interest on the deposit was covered by the bond, and that the bond was liable for the payment of the interest to the State, as well as the re-payment of the deposit.

Counsel for appellee also cites and relies upon Bolles on Modern Law of Banking, page 479, Morse on Banking (4th Ed.), section 47, and Pratt's Digest of National Banking Laws, page 11, to the effect that among the implied powers of a bank is that to secure deposits. This statement of the law is not elaborated upon by any one of the authors, and we are constrained to believe and hold that the authors used this expression in its limited sense, and that it was meant to apply to that class of cases where, by express statute, a particular deposit was to be secured before it could be placed in bank. Under such circumstances the bank, before receiving it, would necessarily have the right to execute the bond, but this would not, by any means, justify the claim that the bank had the right to secure other deposits, simply because it had the right to secure a particular deposit, which the law expressly required to be secured before it could be deposited. But, whatever meaning these distinguished authors may have intended should be given the statement referred to, we are unwilling to hold that a bank, in the absence of some statutory authority, may exercise a right or power which would enable it to perpetrate a fraud upon any of its depositors.

There being no express authority given to a bank to secure a deposit, by pledge of its assets, and it being apparent that such a practice would have a tendency, and

pave the way, to the perpetration of fraud, by putting it in the power of the officers of a bank to give a preference to favored customers, it cannot successfully be maintained that a bank has the implied right or power to do so. Banks, undoubtedly, have the right to do many acts and things not expressly authorized by their charters, or specifically designated in the general laws adopted for their organization, regulation and government. These are termed implied powers, but such powers are those found necessary to enable the banks properly and expeditiously to carry out and enjoy the powers, rights and privileges expressly given them. Before a bank should be adjudged entitled to exercise any power, not expressly given, it should be clearly established that such power is essential to the proper conduct of its business, and necessary to enable it properly to enjoy, use and carry out its express powers. When such test is applied to the claim of right, on the part of a bank, to prefer one of its depositors over another, it is apparent that the right should be denied. The exercise of such a power would necessarily be fraught with great possibilities for the perpetration of fraud, and would undoubtedly have a tendency to destroy the faith of the depositing public in banking institutions.

When a legislative act is susceptible of a dual construction, one of which secures equality and equity, and the other paves the way to the perpetration of fraud, no court would hesitate to adopt that construction insuring fair dealing. So, likewise, when it is a question as to whether or not a bank has the implied power to secure one depositor at the expense of the others, the effect of the exercise of such power is a proper subject of inquiry; and when we find that the exercise of such power would enable the bank, or at least put it in its power, to perpetrate a fraud upon some of its depositors, we unhesitatingly hold that the exercise of such a power is not necessary to the proper enjoyment of its charter or statutory privileges, and hence, that it has not such implied power; and its attempt to exercise it is an act ultra vires and void.

In taking this position we are aware that cases are to be found where courts have recognized this right in banks, but, upon examination, we find that there was express statutory authority authorizing it; and, of course, where authority is expressly given to a bank to secure certain deposits, the bank, in so doing, is acting, not be-

yond, but clearly within, its legal rights; but we have found no case where it has been held that a bank, in the absence of some statutory authority, had the right to secure, by secret pledge of its assets, one depositor at the expense of the others, and thereby deprive the latter class of their proper distributable share of the assets of the bank, in the event of its insolvency.  The rigid enforcement of this principle will not deprive banks of the right to exercise any of their legitimate functions; but, on the contrary, will build them up in the confidence of the depositing public; for, when depositors know that the bank not only may, but must, deal fairly with them, banks will take that position in the confidence of the public in which these great institutions deserve to be held.

The aim and trend of all modern legislation on the subject of banks has been to protect the depositor.  The law imposing double liability upon stockholders—that making provision for the publication of sworn statements as to the bank's condition, at regular intervals, and lastly, that providing for a rigid examination and inspection by competent men, all look primarily to the protection of the depositor.  The law makes ample provision for the protection and security of all depositors.  They have not only all of the assets of the bank for their security, but, in addition, each stockholder is liable for double the par value of his stock, and he may be required to contribute to this extent, if necessary, to protect the depositors.  No system has been invented and no scheme has ever been suggested that would more equitably and fairly protect the depositors.  If banks are made to observe strictly the law and not allowed to divert their assets from their proper and legitimate channel, it will be in rare instances indeed that depositors will feel the need of special security for their funds when placed in banks. Sound business banking principles demand that no bank should be permitted, under any circumstances, to secure any depositor by a pledge of its assets.  But, where, by charter provision or statute, a bank is required to secure a state, county, court, or other deposit, before it can receive such deposit, the security which the bank gives must be such as it can procure by personal endorsement or otherwise, which does not involve a pledge of its assets.  For many years the State officials have placed such a construction upon the law requiring State depositaries to give security before they can receive any part of the State's money.  The assets of these State depositaries

have never been pledged as security for State deposits, but the State has invariably received as security for its deposits the endorsement of individuals or solvent bonding companies. This is, undoubtedly, the character of security which the legislature contemplated should be given, when it enacted section 4693, Kentucky Statutes, requiring State depositaries to give security for the public funds, and sections 411 and 2903, requiring depositaries for chancery court and city funds to give security for their safekeeping and payment. We are not advised as to the interpretation which court officers and city officials have placed upon the sections of the statutes quoted, but, as the giving of personal security for the safety and return of such public deposits, as are required by law to be secured, would fully meet the ends of the law, and in nowise impair the value of the bank's assets as security for all of its depositors, it is apparent that this is the character of security contemplated. That this was the legislative intent is made the more apparent when it is remembered that all of the assets of the bank stand pledged to secure all of its deposits, and it cannot be that the legislature intended that this security, for all of the deposits, should be impaired in order that a few, or any number less than all, might be the better secured. In other words, the legislature evidently did not intend that the security of any depositor should be impaired, in order that that of another might be increased. So, the only reasonable construction that can be placed upon these statutes, requiring certain public funds to be secured by the depositary, is that the security that such depositary shall give must be other than a pledge of its own assets.

There is no statute requiring the deposits of the county treasurer to be secured by the depositary, and there is no express power, under which the bank was authorized to secure him, by a pledge of its assets, no necessity existed for its doing so, in order to enable it properly to conduct its business as a banking institution; hence, its attempt to do so was an act ultra vires and void. The chancellor erred in holding that it did have such power.

Judgment reversed and cause remanded for further proceedings consistent with this opinion.

Whole court, except Judge Nunn, sitting.