WALTER PERRY, BANK COMMISSIONER, ET AL. *vs.* THE COMMERCIAL BANK AND TRUST COMPANY.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 26th—decided July 27th, 1934.

*Benedict M. Holden,* with whom were *William H. Comley* and *Thomas D. Gill,* for the appellants (depositors).

*Jonathan Grout,* with whom was *Edward· J. McCarthy,* for the receiver.

*Ernest L. Averill,* Deputy Attorney-General, with whom was *H. Roger Jones,* Assistant Attorney-General, and, on the brief, *Warren B. Burrows,* Attorney-General, for the Bank Commissioner.

*Vincent L. Keating,* with whom was *Arthur M. Marsh, amicus curiae* (for the Association of Connecticut State Banks and Trust Companies).

MALTBIE, C. J. This is an appeal from a judgment of the Superior Court answering certain questions propounded in a motion for advice filed by the receiver of the defendant bank. The facts out of which arose the situation leading to the filing of the motion, as they are stated in the finding of the trial court, are briefly as follows: The defendant is a bank organized under the law of this State and located at Bridgeport. It is a commercial bank having a savings department. In January, 1932, there was general difficulty in Bridgeport concerning withdrawals from the savings departments of banks. There was a heavy demand for withdrawals from the savings department of the defendant bank; the principal assets of that department were mortgages which were not easily saleable or collectible; and if the bank had not been able, by a loan, to secure funds it would have had difficulty in meeting these demands and would have had to close its doors. On January 4th, 1932, because of these facts, it invoked a rule requiring a ninety-day notice of withdrawals from its savings department. During January and February notices of withdrawal of sums amounting to something over $260,000 were filed. The bank had already borrowed from the Irving Trust Company of New York $150,000 for the sole purpose of meeting withdrawals in its savings department, and secured this loan by collateral of that department and the proceeds of the loan were used solely to pay depositors in that department.

On March 14th, 1932, the bank applied to the Reconstruction Finance Corporation for a loan and submitted a list of collateral by which it offered to secure it. As amended, this application stated that the collateral offered consisted entirely of investments of deposits in its savings department and should not be used by the corporation as security for any loan of the

bank for the benefit of any other of its departments until after the payment of all depositors in the savings department, but upon such payment it should be security for any and all other indebtedness of the bank to the corporation. The application was approved for a loan of $500,000. The bank issued to the corporation its note in that amount, payable to the order of the corporation, and as security executed and delivered assignments of mortgage notes and of the mortgages securing them. The assignments were absolute in form and were never recorded upon the land records. By the terms of the note all funds received by the bank on it were to be applied by it solely to the payment of the depositors in its savings department or for the payment of the note, and no part of the loan was to be used in any way for the benefit of any other department of the bank; and the collateral pledged as security was not to be used by the payee as security for any loan to the bank for the benefit of any other department until after the payment of all depositors in the savings department, but thereafter it was to stand as collateral to secure any other indebtedness of the bank to the corporation. The $500,000 loaned to the bank was deposited in the savings department of the Irving Trust Company of New York and from it the loan previously made by that company was paid. Upon securing the loan the bank withdrew the requirement for a ninety-day notice of withdrawals and between March 19th, 1932, and May 20th, 1932, depositors in the savings department withdrew more than $259,000, these withdrawals being largely met from the proceeds of the loan; and all the money received from the corporation except that used to pay the loan by the Irving Trust Company, was used exclusively for the payment of depositors in the savings department.

On May 20th, 1932, the bank applied to the Reconstruction Finance Corporation for a further loan not to exceed $300,000, to be secured by collateral consisting of notes and mortgages which were assets of its savings department and had an aggregate face value of about $357,000. This application was approved on June 23d, 1932, for a loan of $200,000, which sum was placed to the credit of the savings department of the bank in the Chase National Bank in New York City. As security for the loan, the bank executed two notes dated May 20th, 1932, payable to the order of the corporation, aggregating $200,000, and executed and delivered assignments of certain mortgage notes, and of the mortgages securing the same, assets of its savings department. The assignments were absolute in form and were never recorded. The terms of the application for this loan and of the notes given for it were substantially the same as those contained in the first application and the note then given. Between May 20th, 1932, and August 20th, 1932, depositors in the savings department withdrew more than $970,-000, these withdrawals being principally met from the proceeds of the loans made by the corporation and all of the funds received from the corporation were used exclusively in the payment of savings depositors. The sums received from the corporation under both loans were not allocated, paid out and distributed pro rata to all the depositors in the savings department, although none of them at any time waived any rights which they might have under § 3908 of the General Statutes.

On August 29th, 1933, the bank commissioner issued an order restraining the bank from paying out funds or receiving deposits, and on September 15th, 1933, upon his application, a receiver of the bank was appointed, and the appointment thereafter confirmed.

Previous to the appointment of the receiver, the bank had collected interest and principal on account of the mortgages pledged to the corporation and remitted the same to it, these remittances being credited on the principal and interest account of the loan. After the receiver was appointed the court authorized him to continue to collect principal and interest due on the mortgages and remit the sums collected to the corporation, such action to be without prejudice to the respective rights and obligations of the corporation, the bank or its receiver, and the depositors, creditors and stockholders of the bank, pending a final determination of their rights in and to the pledged assets.

On April 4th, 1934, the receiver filed a motion for advice, briefly stating the facts above detailed and alleging that the corporation, having possession of the notes and mortgages pledged to it, claimed to hold such securities and the proceeds thereof as collateral for the loans made by it under rights superior to those of the depositors in the savings department to such assets, whereas various depositors in the savings department had asserted rights in and to those assets which were in conflict with the claims of the corporation. In this motion the receiver asked the advice of the court with reference to two questions: Did the bank have the power to pledge the segregated assets of its savings department for the purposes for which they were pledged, and if it had such power, did the corporation obtain rights in those assets superior to the rights of the depositors in the savings department of the bank. The trial court answered both questions in the affirmative, and certain depositors have appealed.

In this court the plaintiff in this action, the bank commissioner of the State, moved that the appeal be erased from the docket for the reason that the record

discloses that the Reconstruction Finance Corporation is a necessary party to the determination of the questions involved in the motion, and that it was not a party of record and did not participate in the proceedings. It is of course true that no decision made in this case could be binding upon the Reconstruction Finance Corporation unless it was a party to the action. That by no means precluded the Superior Court from giving such advice to the receiver as was necessary to enable him properly to perform his functions. If the receiver is advised that he is entitled to have delivered to him, absolutely or conditionally, the assets pledged by the bank to the corporation, he can obviously enforce that right only by an action brought to a court having jurisdiction over the subject-matter involved and over the Reconstruction Finance Corporation as a party. Strictly, the advice to which, in such a situation as that presented in this case, the receiver was entitled, was such as would inform him as to his duty in the premises, whether he ought to take steps to attempt to secure by action or otherwise, the delivery by the corporation to him of the assets pledged by the bank to it. The answers given by the trial court to the questions propounded in the motion, in a sense went beyond the extent to which the receiver was entitled to advice, but if the trial court was right in its conclusions that the pledge of the assets by the bank was lawful and that it gave to the corporation rights to those assets superior to those of the depositors in the bank, it necessarily followed that the receiver would not be justified in taking steps to secure delivery of those assets to him by action or otherwise. We approach the questions raised by the appeal from this standpoint. It is true that in *Lippitt* v. *Thames Loan & Trust Co.*, 88 Conn. 185, 207, 90 Atl. 369, we refrained from answering certain questions bearing

upon the rights of certain persons not parties to the action; but we also pointed out that the questions were not argued and the receiver merely submitted certain authorities. That decision is not authority that, had the questions been properly presented to us, we might not have answered them, at least to the extent above indicated. The motion to erase the appeal is denied.

There is no provision in the General Statutes expressly giving to banks the power to borrow money and pledge their assets to secure loans, although there is a recognition of such a practice in § 3868, wherein the bank commissioner is given power to order institutions under his surveillance to keep their securities within the State "except when such securities are held as collateral." That it has been the practice of Connecticut banks to borrow money when necessary is evident from the reports of the bank commissioner of the State, and as is said in *Texas & Pacific Ry. Co.* v. *Pottorff*, 291 U. S. 245, 260, 54 Sup. Ct. 416, "loans made by one bank to another commonly involve a pledge of the assets, since only upon such a condition is the transaction possible." That, speaking generally, the banks of Connecticut do have the implied power to borrow money and pledge their assets as collateral, is hardly open to question. *Auten* v. *United States National Bank*, 174 U. S. 125, 19 Sup. Ct. 628; *Wyman* v. *Wallace*, 201 U. S. 230, 243, 28 Sup. Ct. 495; *Curtis* v. *Leavitt*, 15 N. Y. 9, 51; *Farmers & Merchants State Bank* v. *Consolidated School District No. 3*, 174 Minn. 286, 291, 219 N. W. 163; *Harris* v. *Randolph County Bank*, 157 Ind. 120, 60 N. E. 1025; *Commercial Banking & Trust Co.* v. *Citizens Trust & Guaranty Co.*, 153 Ky. 566, 574, 156 S. W. 160; *Smith* v. *Baltimore & O. R. Co.*, 48 Fed. (2d) 861, 868; 4 Michie, Banks

& Banking, p. 55. Nor do we understand the appellants to dispute this.

Their contention is, however, that a savings bank, and particularly the savings department of a commercial bank, has not the power to pledge its assets to secure a loan obtained by it for use in the discharge of its obligations. They argue that to permit a savings bank or a savings department to borrow money and pledge its assets to secure the loan and to use the money so secured to pay depositors, would be, should insolvency occur, to produce an inequality in the amounts received by depositors. The business of carrying on a savings bank or department necessarily involves the receipt by the bank of deposits made from time to time and the repayment to depositors of the amounts so received, in whole or in part, as they may see fit to make demand for them. As long as the bank is a going concern it must necessarily pay to any depositor who demands it, the whole or a part of his deposit, and any depositor who in good faith and without knowledge that the bank is insolvent, receives money upon such a withdrawal is legally entitled to hold it. *First National Bank & Trust Co.* v. *Manning,* 116 Conn. 335, 338, 164 Atl. 881. It necessarily results, therefore, that there will be in a sense an inequality among depositors whenever insolvency ensues, because those who have withdrawn deposits, though it be on the very eve of insolvency, will receive the whole of the sum so withdrawn, whereas depositors leaving their money in the bank will be enabled to get perhaps only a small fraction of the amount of the deposit. Whatever the source of the fund from which such withdrawals are paid, whether it be the deposits of others, the sale of investments, or loans secured by the bank, the result will be the same. The mere fact, therefore, that a savings bank or savings department uses money

borrowed by the pledge of its assets to pay withdrawals before insolvency and so enables the depositors so withdrawing to obtain the money paid to them, whereas depositors not making withdrawals will be relegated to their ratable share in the assets of the bank at the time of insolvency, affords no sound reason for denying the power of the bank to borrow and secure the loan by the pledge of its assets.

The appellants, however, particularly rely upon the provisions of § 3908 of the General Statutes. These require that all banks and trust companies maintaining a savings department shall invest deposits received according to the requirements of the statutes concerning investment of deposits in savings banks, and that such investments shall be segregated and set apart and not mingled with other assets of the bank or trust company, but be for the exclusive protection of the depositors in the savings department, not to be used to pay any other obligation or liability of a bank or trust company until after the payment of all the depositors in that department. We have held that the effect of this statute is to require that the investments of deposits in the savings department of a bank must be kept segregated from the other investments and funds of the bank for the protection of depositors in that department, that the title to such investments is in the bank and that any return by way of interest or dividends received from them belongs to the bank, and that after all depositors in the savings department have been paid in full, any remaining assets in that department likewise belong to the bank. *Lippitt* v. *Thames Loan & Trust Co.*, 88 Conn. 185, 192, 90 Atl. 369; *Bassett* v. *City Bank & Trust Co.*, 115 Conn. 1, 27, 160 Atl. 60; *Bassett* v. *Merchants Trust Co.*, 115 Conn. 364, 161 Atl. 785.

The appellants call attention to the statement we

made in *Lippitt* v. *Thames Loan & Trust Co.,* 88 Conn. 185, 193, 90 Atl. 369, that the depositors in the savings department of the defendant bank in that case "were the equitable owners of the savings assets set apart in this department, and had made the company their agent to receive, care for, and invest their moneys," and to expressions in other places in that opinion characterizing the rights of depositors as a lien on the assets of the savings department. They also refer to the statement made in *Bassett* v. *City Bank & Trust Co.,* 115 Conn. 1, 27, 160 Atl. 60, that "it will thus be seen that while the depositors in the savings department have special rights in the fund, they are not the owners of it, the title in it being in the bank as such," and distinguishing the rights of depositors in mutual savings banks, where the banks "act only as an agent and representative of the depositors and the assets of the banks are actually owned jointly by the depositors in proportion to their deposits." They also cite decisions from other States wherein under somewhat similar statutes the assets of a savings department of a bank are spoken of as a trust fund, the depositors being the *cestuis que trustent.*

In strict accuracy, the relationship between the depositors in the savings department of a commercial bank and the assets of that department does not fall within the common-law conception of a lien, equitable ownership or a trust. The depositor does not, strictly speaking, have a lien, because it is inherent in the conception of a lien that it apply to a definite *res; Bassett* v. *City Bank & Trust Co.,* 116 Conn. 617, 631, 165 Atl. 557; and under the statute the banks have authority to augment the sum in their hands by receiving deposits and deplete it by meeting demands for withdrawals, and to buy, sell or exchange investments in the department, provided those investments come

within the requirements of the statutes concerning the investment of deposits in savings banks. The relationship is not strictly one of equitable ownership of the assets, nor of the holding of those assets in trust by the bank, for the reason that the bank has a beneficial interest in, as well as legal title to, the investments; as we have pointed out, interest or dividends received from those investments belong to the bank, as does any residue remaining after the depositors have been paid in full. The interest of a depositor in the assets of a savings department partakes largely of the nature of these three established relationships, but it is in fact a peculiar interest created by the terms of the statute, the nature of which we have not in our later decisions sought to bring definitely within any common-law classification of rights; see *Bassett* v. *Merchants Trust Co.*, 115 Conn. 530, 538, 161 Atl. 789; and the application of the principles governing liens, equitable ownership and trusts, while in many instances helpful, cannot be finally accepted as the basis for determining as to the existence of any particular right on the part of a depositor. If the assets of a savings bank or of the savings department of a commercial bank cannot be used as collateral to secure a loan to be used to discharge the obligations of the bank or that department, it is not for the reason that a use of its funds would be forbidden because they are subject to a lien, equitable ownership or trust such as is recognized at common law.

In *S. O. & C. Co.* v. *Ansonia Water Co.*, 83 Conn. 611, 633, 78 Atl. 432, we quoted from an earlier opinion of this court that corporations "may exercise all the powers within the fair intent and purpose of their creation, which are reasonably proper to give effect to powers expressly granted. In doing this, they must

have a choice of means adapted to ends, and not to be confined to any one mode of operation," and from an authority upon corporation law, that "a transaction may prima facie appear to be wholly foreign to the business for which a corporation is formed; and yet, if it be auxiliary to any legitimate purpose of the company and adapted to attain the same more advantageously, it is impliedly authorized." See *Catlin* v. *Eagle Bank,* 6 Conn. 233, 240; *Western National Bank* v. *Armstrong,* 152 U. S. 346, 351, 14 Sup. Ct. 572; 1 Morse, Banks & Banking (6th Ed.) § 47. The fact that banks have for many years been accustomed to borrow money and secure the loans by pledge of their assets goes far to show that such a right is one reasonably appropriate to the powers expressly granted them and adapted to attain their legitimate purposes. Savings banks are authorized to invest in mortgages on real estate; General Statutes, Cum. Sup. 1933, § 1032b; and the reports of the bank commissioner are evidence of the fact that a considerable portion of the money deposited in savings banks and the savings departments of other banks is so invested. Such investments cannot quickly be turned into cash, particularly in times of financial depression, the very times when savings banks are likely to be subjected to demands for withdrawals to an unusual amount; and such a situation is intensified in a period where suspicions and rumors as to the insecurity of banks are rife. So where in a period of financial depression the market value of securities falls rapidly, it might be ruinous to a savings bank or the savings department of a bank to be compelled, in order to meet heavy withdrawals, to sell its investments. Under such circumstances, there can be no doubt that the best interests of depositors can often be better guarded by the bank securing funds through a loan, a loan which, as we have pointed out,

must almost necessarily be secured by assets of the bank. In this way it may be possible to tide over a temporary emergency, and to continue the bank, with the result that all its depositors will ultimately be paid in full, whereas forced liquidation would almost certainly result in a greater or less loss to all depositors. The right to secure loans and to pledge the assets of a savings bank or the savings department of a bank as security for them is certainly one which is auxiliary to the legitimate purpose of the bank to pay demands for withdrawals made upon it by its depositors without endangering the security of other deposits in it, and may be the means most advantageously adapted to attain that end. It is true that to adopt such a method of securing funds to meet demands for withdrawals may be in a particular instance unwise and if, as happened in this case, despite this being done, the bank is not able to weather the storm, the result may be disadvantageous to depositors who leave their deposits with the bank until insolvency ensues, but this is not a reason for denying the power where it is reasonably adapted to the ends to be served by the bank, if properly employed. That the power to obtain such loans carries with it no threat to the rights of depositors as a whole is indicated by the fact that the bank commissioner, appearing by the attorney general, and counsel for the association of state banks and trust companies, appearing as *amicus curiae,* maintain that it is a power which banks ought to have.

We have approached the question from the standpoint of the implied powers of a savings bank or of any bank with reference to its savings department, because, if such a power exists, there can be no question that the defendant bank possessed it. Its charter authorized it to hold, sell, lease, mortgage, pledge and

convey its assets. 15 Special Laws, 812. While this broad power would undoubtedly be subject to limitations growing out of the nature of the business in which the bank was engaged, necessary for the protection of its depositors, and having their basis in statutory provisions or rules of the common law, the situation here presented furnishes no basis upon which a limitation might rest which would forbid the exercise of the power as regards the assets of its savings department.

The cases cited by the appellants wherein the pledging of its assets by a bank have been held to be beyond its powers, are cases where the assets were pledged to secure a deposit; they deal with a very different problem than the one before us and several of them expressly distinguish the two, recognizing the right of a bank to pledge its assets to secure loans it has obtained; *Farmers & Merchants State Bank* v. *Consolidated School District No. 3,* 174 Minn. 286, 291, 219 N. W. 163; *Commercial Banking & Trust Co.* v. *Citizens Trust & Guaranty Co.,* 153 Ky. 566, 576, 156 S. W. 160; *Smith* v. *Baltimore & O. R. Co.,* 48 Fed. (2d) 861, 868; *Sneeden* v. *City of Marion,* 64 Fed. (2d) 721, 725; a distinction having sanction in the statutes in North Dakota; *Divide County* v. *Baird,* 55 N. D. 45, 212 N. W. 236. On the other hand, in *Fifth Ward Savings Bank* v. *First National Bank,* 48 N. J. L. 513, 7 Atl. 318, it was expressly held that a savings bank had power to borrow money and pledge its assets to secure the loan.

Our conclusion is, therefore, that the defendant bank had the power to secure the loans from the Reconstruction Finance Corporation and to pledge the assets of the savings department to secure them. No contention is made that there are particular circumstances involved in the situation which would make

the exercise of the power in the instances we are considering so improper as in any way to invalidate the transactions. It necessarily follows that the trial court was correct in answering in the affirmative the question whether the bank had the power to pledge the segregated assets of its savings department for the purposes stated in the applications, and the result of that conclusion is that the receiver would not be justified in seeking to secure the delivery to him by the corporation of those assets except in accordance with the terms upon which the loans were made.

There is no error.

In this opinion the other judges concurred.