## George J. Bassett, Bank Commissioner, vs. The City Bank and Trust Company.

Maltbie, C. J., Haines, Hinman, Banks and Avery, Js.

(1)

Argued March 22d—decided April 27th, 1932.

*Lucius F. Robinson* and *William W. Fisher,* with whom was *Barclay Robinson,* for Thomas Hewes, Receiver of the defendant bank.

*Phillips Ketchum,* of Boston, Massachusetts, with whom, on the brief, was *Noel Morss,* for the Federal Reserve Bank of Boston.

*Arthur L. Shipman,* with whom, on the brief, was *Arthur L. Shipman, Jr.,* for depositors.

*Benedict M. Holden,* for depositors.

*Harry L. Nair,* with whom, on the brief, were *Solomon Elsner* and *Lewis Fox,* for a depositor.

*Ernest L. Averill,* Deputy Attorney-General, with whom were *Warren B. Burrows,* Attorney-General, and *H. Roger Jones,* Assistant Attorney-General, for the Bank Commissioner.

*Arthur E. Howard, Jr.,* for The Travelers Bank and Trust Company, receiver of The Unionville Bank and Trust Company.

*Stuart N. Dunning,* for David Carlson, beneficiary under a trust.

*Isador E. Finkelstein,* for The Foley Steamship and Travel Agency.

MALTBIE, C. J. This is a reservation seeking advice as to certain questions which have arisen in receivership proceedings brought against the defendant bank. On January 2d, 1932, before the hour of the opening of the bank for business, the bank commissioner of the State, acting pursuant to § 3870 of the General Statutes, issued an order restraining the defendant

from paying out funds or receiving deposits. On January 7th, 1932, upon the application of the commissioner, a temporary receiver of the defendant was appointed by the Superior Court, and on the same day he duly qualified as such and has been acting in that capacity ever since. The bank had, in addition to its commercial department, a savings and a trust department. The stipulation for the reservation presents four distinct situations and the facts and questions as to each are stated in a separate division. We shall follow that method of dealing with them.

A

One group of questions concerns the right of the makers of certain notes held in the savings department and carried on its books as assets of that department to set off against their indebtedness upon them deposits they had in the bank. The specific question we are asked is this: "Are the makers of any of such notes entitled to set off their deposits in either the commercial department or the savings department of the defendant corporation against their indebtedness to the defendant corporation on said notes?" The facts stipulated present three different situations with reference to these notes. In the first situation the loans for which the notes were given were in fact made out of the funds of the savings department and the notes have always been carried on the books of the bank as assets of that department, both facts being without the actual knowledge of the makers of them. The right of the makers of these notes to set off against them their deposits in either the commercial or the savings department is effectively answered by our ruling in Lippitt v. Thames Loan & Trust Co., 88 Conn. 185, 90 Atl. 369, where we held that, in the case of a bank having similar departments, commercial and sav-

ings, a depositor in the savings department who was also a borrower from it could not set off his deposit in it against his debt to it, nor could a borrower from that department set off against his indebtedness to it his deposit in the commercial department. When a borrower obtains a loan from a bank having both commercial and savings departments, without specifying or even inquiring as to the department from the funds of which it is to be made, he submits the disposition of the loan as between the departments to the will of the officers of the bank and must abide by the disposition they see fit to make of it. See *Kelly* v. *Commissioner of Banks*, 239 Mass. 298, 131 N. E. 855. When funds of the savings department representing the deposits in it are taken to make the loan, the note becomes a part of the investments of that department which must, under the provisions of General Statutes, § 3908, be segregated and set apart for the protection of the depositors in it. Whether or not it was such an investment as was authorized by the statute for the funds of the department is not material as regards the depositor's right to a set-off; nor would the expectation of the borrower that the loan was to be made from the funds of the commercial department and to remain as an obligation due to that department, increase his right. The reason why a right of set-off of deposits in a savings department against a loan made from its funds is not permitted, is stated in the *Lippitt* case. After pointing out that the depositors have an equitable interest in the assets set apart in the department, that each has an equal right to a proportional share to the extent of his deposit, and that any debt he owes to the department is owed to all its depositors, we said (p. 193): "Upon dissolution or insolvency he was entitled to share in its assets ratably with other depositors. If a depositor who was

a borrower could set off his deposit at its face value against his debt, he might secure full payment of his deposit and a greater share of the assets than his fellow depositors. This would destroy the rule of equality, and give a greater share of the assets to the borrowing than to the nonborrowing depositor." When the assets of the savings department were used to make the loan, the right of depositors in it to an equitable share in its proceeds attached. A borrower of the bank whose loan has been taken from the funds of the savings department cannot set off against it any deposit he may have in either department of the bank.

The second situation presented by the stipulation concerns notes representing loans originally made from the funds of the commercial department where the notes were thereafter but before maturity transferred to the savings department for cash or other assets of equivalent value. We cannot regard the commercial and savings departments as separate institutions or corporations; we said of a similar situation in the *Lippitt* case (p. 197): "If these departments constituted separate institutions, the savings depositors would be confined to the assets of their own department. We do not think the charter creates, or the law providing for the setting apart of savings funds and investing them in savings bank investments intended to make of these departments, independent institutions." The question cannot be approached from the standpoint of an indorsement or assignment of the notes from one party to another, and the statutes governing the right of set-off in such situations are not applicable. The notes were merely shifted from the commercial department to the savings department in return for assets of the latter. That the bank having a note in its commercial department representing a loan made from its funds had the right to transfer it, for an equivalent

value in cash or securities, to its savings department, does not admit of question. Ordinarily the shifting of a note from one department of a bank to another would not destroy any right of set-off which the borrower might have. But when these notes were transferred, they took the place of the cash or securities turned over to the commercial department in return for them and became an investment in which funds of the savings department were made.

A claim by the borrower to a right of set-off cannot rest upon the fact that the savings department took the note subject to an independent equity in his favor. The situation is not like that which might occur where funds of the department were invested in a security which was subject to a lien, so that it took the investment, not free and unincumbered, but only in subordination to the rights of the lienor. In the first place, such a right, if it existed, as to any of these notes, would extend only to a deposit the borrower might have in the commercial department and could not be enlarged to include any deposit in the savings department. But that aside, the right to a set-off is not an incident to a debt but to the remedy to secure payment of it. "The right of set-off, in short, does not depend upon the mutuality of debts in their origin, as an inherent quality attaching itself to such debts, but upon the situation and rights of the parties, between whom it is sought to be enforced; and whether the suit be at law or in equity, there must be personal debts existing between them, and not merely between either of them, and third persons. As has been very properly remarked at the bar, it is a privilege or right attaching to the remedy only; which in some States may be allowed by their laws, and in others, denied. But it touches not any obligation of contract or vested right." Story, J., in *Greene* v. *Darling,* 5 Mason (U. S.

C. C.) 201, 215; *Wolcott* v. *Sullivan,* 1 Edw. Ch. (N. Y.) 399, 403. There must be, at the time an action by one party or the other is brought, or when a settlement is made in lieu of an action, mutual debts which can then be set off one against the other. There are circumstances where rights in third parties will arise and prevail over a set-off which might otherwise exist. The most usual example is that of the negotiation of a negotiable instrument representing the debt before maturity to a bona fide purchaser for value. A similar situation exists where a bank transfers a note from its commercial to its savings department in return for funds of that department and by virtue of the statute the rights of the other depositors in that department to share equally in its investment has attached. The makers of the notes which, before maturity, were transferred to the savings department in return for cash or assets of that department of equivalent value, cannot set off against the debt represented by the note any deposit they may have in the savings department. Nor can they, under the decision in the *Lippitt* case, set off against them any deposit they may have in the commercial department. See *Cosmopolitan Trust Co.* v. *Rosenbush,* 239 Mass. 305, 131 N. E. 858; *Bieringer-Hanauer Co.* v. *Cosmopolitan Trust Co.,* 247 Mass. 73, 141 N. E. 566; *Dole* v. *Chattabriga,* 82 N. H. 396, 134 Atl. 347; *Cosmopolitan Trust Co.* v. *Leonard Watch Co.,* 249 Mass. 14, 143 N. E. 827.

The third situation presented by the stipulation involves notes which represent loans made from the funds of the commercial department but which were transferred before maturity to the savings department while the defendant was entirely solvent, as an addition to the investments in that department, in order to compensate for depreciation in the market value

of the securities held in it. These notes present a very different situation. In the absence of statute, it is not enough to defeat a set-off of deposits in a bank that its allowance will create a certain inequality among the depositors because thereby one indebted to it may be enabled to secure the benefit of the full amount of his deposit while others will obtain only a proportionate share. Thus, in the *Lippitt* case (p. 195), we held that a borrower from the commercial department might set off against his loan any deposit he had in the savings department. As we have stated, the reason why set-offs may not be allowed as against notes representing investments of funds of depositors in the savings department is that, by virtue of the provisions of § 3908 of the General Statutes, each depositor in that department has a special interest and the right to a proportionate share in all those investments. But that statute requires the investment of the deposits in the savings bank in a certain way and it is those investments which are required to be segregated for the exclusive protection of depositors. Assets such as the notes now in question are not within the purview of the statute because they do not represent the investment of deposits in the department. There does not exist as to them the countervailing rights which depositors in that department have in the investments made of their deposits and no reason appears why the usual rule as to set-off should not apply. That this is the effect of the statute becomes clear when we consider that in the *Lippitt* case a considerable balance between the amount of assets set aside for the savings department and the amount of its deposits, uninvested and in the general funds of the bank, was held not to be within the statute. If the right of set-off was an incident to the debt, it might be that the set-off would be limited to deposits in the commercial department

from the funds of which the loan was made, but, as we have seen, it is a right incident to the remedy and must then apply at the time when the right accrues, that is, at the time of the order of the bank commissioner requiring the defendant to discontinue its business. It must therefore include any deposit in the savings department as well as any in the commercial department.

## B

HINMAN, J. The Federal Reserve Bank of Boston, herein referred to as the claimant, makes claim to priority in payment over the claims of depositors and general creditors, on behalf of the owners of certain checks and other items sent by it for collection, under the agreement hereinafter mentioned, to the defendant bank, also as to certain other items sent to the Unionville Bank and Trust Company which attempted to remit to the claimant through the defendant. These items were forwarded under letters of transmittal designated in this proceeding as letters X, Y, and Z.

For some years an agreement has been in force between the claimant and the defendant by which the claimant agreed that all items drawn on the defendant which the claimant received should be forwarded to the defendant for collection. The defendant agreed to collect and remit for cash letters on the same day when received, returning dishonored items, and to remit for non-cash items on the day they were collected. The defendant had the option of remitting by a shipment of money, or by acceptable bank drafts drawn on Boston or New York, New York drafts being sent to the Federal Reserve Bank of New York for the claimant's account.

The items transmitted in letter "X" consisted of checks drawn on the defendant which had been sent

to the claimant by member banks or other Federal Reserve Banks for collection. The defendant collected the checks (except some returned unpaid and not in issue) by charging the deposit accounts of the respective drawers and marking the items "paid," and on the same day forwarded its remittance draft for the amount of the items collected, drawn on a New York bank, to the Federal Reserve Bank of New York for account of the claimant. The item sent under letter "Z" was a "non-cash" item payable at defendant bank and was collected by charging a depositor's account there; the remittance draft was drawn on a Boston bank and forwarded direct to the claimant. Letter "Y" was sent to the Unionville Bank and contained checks drawn on that bank which it collected by charging the drawers' accounts, and the defendant, in accordance with instructions from the Unionville Bank, sent its (the defendant's) remittance draft to the claimant for the amount, charging the Unionville Bank's account.

In all three cases the remittance drafts were dishonored on presentation, although drawn against sufficient funds, because the drawee had received notice of the prior suspension of the defendant's business.

The claimant asserts a right to priority in payment over claims of depositors and general creditors, and the questions reserved upon the stipulated facts are: (1) Should the charges made against the deposit accounts of the drawers of the items contained in letters "X," "Y," and "Z" be cancelled? (2) If the answer to the first question is in the negative, has the claimant, to the extent to which it is authorized to prosecute claims by the owners of the items, a claim or claims against the defendant on account thereof, and if so, what is the status of such claim or claims as to classification or priority?

The claimant advances three propositions in support of its assertion of priority: First, that the relation of principal and agent and of *cestui que trust* and trustee existed between the claimant and the defendant not only as to the items before collection but as to the proceeds after collection; second, upon the collection of the items by charging the accounts of depositors, a trust was impressed on the defendant's cash on hand and the receiver took such cash subject to the trust; third, the drawing and sending of the remittance drafts was an equitable assignment *pro tanto* of the deposits with defendant's correspondents in New York and Boston on whom they were drawn.

It appears to be conceded by all parties in interest, as to all of the items involved, that the owners by forwarding them to the bank at which they were payable authorized that bank to accept payment in their behalf, and that when the maker's account was charged, by his express or implied authority, with the amount, he paid the check or other item and is no longer liable thereon. *Federal Reserve Bank* v. *Malloy,* 264 U. S. 160, 44 Sup. Ct. 296, 31 A. L. R. 1261, 1266; *Nineteenth Ward Bank* v. *First National Bank,* 184 Mass. 49, 67 N. E. 670; *Baldwin's Bank* v. *Smith,* 215 N. Y. 76, 109 N. E. 138; note, 52 A. L. R. 995. It follows that the charges made against the deposit accounts of the drawers of the items mentioned in the first question reserved should not be cancelled.

It is undisputed that the sending of the items by the claimant to the City Bank under the arrangement between them created the relation of principal and agent. "So long as the items remained uncollected, the principal could control their disposition. The agent received the items for a specific purpose, and stood toward the principal as a trustee charged with an active duty toward the purpose of the agency, which was

the subject of the trust." *Lippitt* v. *Thames Loan & Trust Co.,* 88 Conn. 185, 202, 90 Atl. 369; *Commercial Bank* v. *Armstrong,* 148 U. S. 50, 56, 13 Sup. Ct. 533. It is also uncontroverted that if the bank had been authorized to credit the proceeds of the collection to the forwarding bank, as upon a reciprocal account, and had done so upon making the collection, the relation between the parties would have changed to that of debtor and creditor and no preference over other creditors could be claimed.

The gist of the claim to a preference is that, since the agreement was that the proceeds were to be remitted on the same business day that the items were received for collection, the trust relation continued together with a right to the fund collected in lieu of the paper which produced it. As between the tests resorted to by the courts to determine the general question whether the trust continues after collection, (1) ability to trace the fund or (2) ascertainment as to whether the relation of principal and agent has ceased and that of debtor and creditor begun, we adopted, in the *Lippitt* case, *supra* (following *Commercial Bank* v. *Armstrong, supra*), the latter as the more satisfactory, ability to trace the fund being held merely evidential of the existence or nonexistence of this relation (p. 202). Although much litigation upon this subject has since intervened, we find in the decisions no reason for a material departure from that view. The examples cited (p. 202) also seem to us to narrow our necessary inquiry and to point somewhat significantly to the conclusion required upon the facts presented. "The agent would change the relation to that of debtor and creditor were it to mingle the funds collected with its own funds, and credit the collections to the sending bank under its arrangement with it to make remittances at specified times. If, on the other hand, it held

the funds collected, intending under its agreement to make immediate remittance, and for a very brief period, for business convenience, keeping the funds set apart or on special deposit for its principal, there would be no change in the relation, the trust would continue, and, on failure of the agent pending transmission of the funds, the principal would be entitled to them."

In that case the record was held insufficient to disclose that immediate remittance, to which the second example pertained, was agreed upon or intended, but it is indicated (p. 204) that in such a situation the mingling of collected funds with the bank's own funds, as distinguished from segregation as by special deposit, would affect adversely the continuance of a trust relation, as "the forwarding bank will get a like sum of money, but not the specific fund collected."

The cases involving the relations between the owner of paper sent to a bank for collection and the collecting bank, after the collection has been made, followed by insolvency of the bank, are extremely numerous and varied as to facts, reasoning, and results. Of the multitude it is practicable to mention only a few which we regard as specially persuasive. In *People* v. *Merchants & Mechanics Bank,* 78 N. Y. 269, most of the facts were quite analogous to those in the present case. The Chemical Bank of New York sent a check, deposited in it and drawn on the defendant bank, to that bank, in accordance with the custom of the Chemical Bank to mail such checks to the Merchants & Mechanics Bank on Saturdays, the latter receiving them on Mondays, and on Tuesdays remitting by drafts on the Metropolitan Bank of New York. The draft remitted covering this check was not paid, a receiver of the Merchants and Mechanics Bank being appointed. It was there held (p. 274) "impossible out of these facts

to construct an appropriation or trust which would attach to the general assets of the bank afterward passing to a receiver, and require their application to the payment of the check in preference to all other indebtedness of the bank." "There was no actual setting apart or appropriation of any specific fund or property of the bank, or of the drawer, for the payment of the check. It is not claimed that the identical funds which had been deposited by the drawer, and on which deposits the credit on the books was founded, were in the possession of the bank, when the check was presented for payment. It is conceded that they were not, and that the bank had used them in its business, and converted them into securities or investments. The bank was simply debtor to the depositor for the balance of deposits which stood to its credit. By charging the check in account, the bank reduced its indebtedness to the depositor by the amount of the check, and constituted itself debtor to the holder of the check to a corresponding amount. It did not undertake to provide for the check by setting apart or appropriating any particular property or fund for that purpose, but by drawing a draft upon the Metropolitan Bank of New York, and remitting that draft to the Chemical Bank. It certainly assumed the payment of the check, but there is an entire failure to show that it impressed a special trust on any of its assets for that purpose." (p. 272). Although a trust has since been held to exist in some collection cases involving variant facts and which did not reach the Court of Appeals, *Baldwin's Bank* v. *Smith* (1915) 215 N. Y. 76, 85, 109 N. E. 138, appears to continue to recognize the necessity of setting aside a distinct fund which can be impressed with a trust, citing *People* v. *Merchants & Mechanics Bank, supra.*

*Hecker-Jones-Jewell Milling Co.* v. *Cosmopolitan Trust Co.* (1922) 242 Mass. 181, 136 N. E. 333, 24 A. L. R. 1148, is widely recognized as a leading case for the denial of a trust relationship. In that case a draft with bill of lading attached was drawn upon a customer of the drawer of the draft, which was forwarded through a local bank to the defendant trust company for collection. The latter received payment by authorized charge against the deposit account of the drawee, but failed without having accounted for the draft, and the drawer claimed a preference in the distribution of the assets. The court said (p. 185): "Ordinarily when a draft has been paid to the collecting bank, the owner's right of control ends, and the relation between the collecting bank and the owner of the draft ceases to be that of agent to principal, and becomes that of debtor to creditor. . . . 'Upon the collection of a draft or check, the [collecting bank] was not required to keep the proceeds by itself as the plaintiff's property, but might mingle it with its own money and make itself the plaintiff's debtor for the amount received. As soon as the proceeds became a part of the funds of the [collecting bank] under this arrangement, the plaintiff's right to control it as specific property was gone, and the plaintiff had instead a right to recover a corresponding sum of money.' " The plaintiff contended that instructions to "collect and remit" imported an agreement to hold the specific proceeds in trust. As to this, after distinguishing some of the authorities relied upon, the court said (p. 186): "On the other hand, the courts in many jurisdictions, emphasizing the fact that all senders of paper for collection know that it is the general practice of banks to mingle the proceeds with their other assets, hold that they must be taken to assent thereto, and hence to the relationship of debtor and creditor instead of

trustee and *cestui que trust* as to such proceeds. Indeed the view contended for by the plaintiff would apparently make the banks guilty of a breach of trust in mingling the proceeds of collections with their other assets, in accordance with the convenient and usual mode of business. [Citing many cases, including *Lippitt* v. *Thames Loan & Trust Co., supra.*] In the case at bar it is clear that the plaintiff, by making the draft collectable through the trust company, authorized a collection by the method which was actually followed. The 'proceeds' produced were merely a diminution of the debt or account owed by the trust company to [the drawee], and a corresponding increase in the trust company's general substance, by means of book entries, and there was no actual reduction to possession of anything that could be regarded as the subject-matter of a trust. In other words, by the reasonable construction of their acts, the parties must be held to have contemplated the relationship of debtor and creditor after the collection."

To the same effect, and largely following the reasoning in the Massachusetts case just mentioned, is *Citizens Bank* v. *Bradley* (1926) 136 S. C. 511, 134 S. E. 510, in which a draft sent to the Pinewood Bank was paid by a check charged to drawee's deposit and on the same day a cashier's check was remitted to the drawer or the forwarding bank, but before it was returned and presented, the bank examiner took charge of the Pinewood Bank. In addition to holding, as in the Massachusetts case, that after the Pinewood Bank accepted the check in payment of the draft the relation between the claimant and the bank was that of creditor and debtor, and that the claimant was put upon the same plane as other creditors and not entitled to a preference, the court said, further (p. 522): "I think, too, that even if the relation [could] be considered a

trust, the claimant has utterly failed to trace into the hands of the liquidating committee any *money*, the 'res' upon which a trust could be imposed. The transaction was one of ordinary banking business; the claimant entered into it for his convenience, knowing that when the collection should be made it would be mingled with the general funds of the bank, and he be allowed a credit to the extent of the collection . . . ; and I see no reason why the court should strain a point to establish a trust in favor of one who took the same chances as all other creditors took, and abrogate the salutary principle that 'equality is equity.' "

Here, equally, it seems, the agreement permitting remittance by draft—which it is obvious and admitted is the usual and only commercially practicable general course—instead of shipment of currency, contemplated and authorized the mingling of the proceeds of collection in the general funds of the bank; it was equivalent to authority to the bank to use for its own general purposes the money collected and to pay the forwarder by draft on its funds on deposit in another bank. An agreement or understanding whereby the collecting bank is to use the money collected, and substitute therefor its own obligation is inconsistent with the idea of a trust and creates the relation of debtor and creditor instead of trustee and beneficiary. *California Packing Corporation* v. *McClintock*, 75 Mont. 72, 241 Pac. 1077.

The decisions of courts of other States disclose diversified attitudes as to the nature and effect of relations such as are here in question and as to the elements and considerations determinative as to whether the relation is one of trust or of debtor and creditor, amounting to a direct and irreconcilable conflict of authorities as to the resulting conclusions. Those cases which adhere to a holding of debtor and creditor ap-

pear to predominate, although there has been manifested in recent years an increasing tendency to allow a preference. Many of the cases denying a trust relation rest their conclusion upon the view that no such relation was intended or that the facts otherwise preclude the existence of a trust; in others the decisive feature is held to be inability to trace the proceeds of the collection; in still others, especially Federal cases, the right to preference is denied where collection is made by check on or charge against a deposit in the collecting bank, on the theory that the assets of the bank are not augmented thereby. Among the more recent and fairly illustrative cases holding in favor of a trust relation are *Federal Reserve Bank* v. *Peters* (1924) 139 Va. 45, 123 S. E. 379, 42 A. L. R. 742, and *Bank of Poplar Bluff* v. *Millspaugh* (1926) 313 Mo. 412, 281 S. W. 733, 47 A. L. R. 754. Many cases upon this general subject are collected and reviewed in notes, 24 A. L. R. p. 1152; 42 A. L. R. p. 754; 47 A. L. R. p. 761, and 73 A. L. R. p. 71, to which reference is made in lieu of further citations. See also 29 Michigan Law Review, p. 548; 8 Thompson, Corporations (3d Ed.) § 6215.

The owner or forwarder and the collector may so agree as to require collection in currency and remittance thereof, but manifestly such a course would be commercially impracticable as of general application; they might agree that the proceeds be held in strict trust and remitted to the forwarder, but such intent is not manifested by the arrangement here presented. Also, many cases have held that even if it were found that the parties intended a trust, preference could not be allowed if the strict principles of tracing were followed. A trust requires a definite subject-matter, which is lacking in the absence of an expressed intent that the collector shall satisfy his duty to the for-

warder out of a specific fund or source. If remittance to the forwarder may be made out of any of the assets of the collector, the *res* to which an equitable lien might attach is wanting even were the other requisites of such a lien found to be present.

Under the Negotiable Instruments Law, a draft or check does not operate as an assignment of the fund on which it is drawn. General Statutes, §§ 4444, 4506; *Alexiou* v. *Bridgeport-Peoples' Savings Bank,* 110 Conn. 397, 402, 148 Atl. 374. The situation here does not satisfy the requirements of an equitable assignment. *Alderman* v. *Hartford & New York Transportation Co.,* 66 Conn. 47, 54, 33 Atl. 589; *Windsor Cement Co.* v. *Thompson,* 86 Conn. 511, 86 Atl. 1; *Sunderlin* v. *Mecosta County Savings Bank,* 116 Mich. 281, 74 N. W. 478.

If modern developments of the operations of forwarding and collection warrant extending additional protection to the owner or forwarder by way of preference in case of insolvency of the collecting bank, it would seem that it can best be afforded by statute, rather than through illogical use of trust terminology or doubtful application of trust principles. This appears to be recognized by the adoption, during the past three years, by eighteen States, of a provision in a Uniform Bank Collection Code which allows a preference when an item is sent to a bank which charges it to the maker's account and fails without having paid or settled for the item. The New York statute to this effect is quoted in *In re Jayne & Mason,* 251 N. Y. Supp. 768, 770. See, "Failed Banks Collection Items, and Trust Preferences," Bogert, 29 Michigan Law Review (1931) 545; "Constructive Trusts and Bank Collections," Townsend, 39 Yale Law Journal (1930) p. 980.

We find nothing in the facts relating to the item

contained in letter "Y" to the Unionville Bank which, at most, places the claimant in a position superior as to priority to that appertaining to the items covered by letters "X" and "Z." As to all the items which are included and represented in the reservation, we hold that they are not entitled to payment before and in preference to the deposits and other liabilities of the bank. Briefs and arguments were confined to the question of such priority. The denial of this may require further inquiry and determination as to the status of these claims with respect to the classification to be accorded them, whether as "deposits" entitled to priority under § 3935 of the General Statutes as against all claims except expenses of settlement, or as "other liabilities" which are relegated to a position subsequent to deposits in order of payment. The receiver also suggests that this further question may affect not only the claims now before us but also others based upon dishonored drafts, treasurer's checks, and certified checks.

AVERY, J. (dissenting). I cannot concur in this opinion. I think the Federal Reserve Bank should be paid in full. A check had been mailed to it drawn against a good account in a New York bank. The New York exchange should be regarded as cash.

## C

HAINES, J. The third of the four questions propounded to us upon this reservation is denominated "C" and is stated as follows: "The defendant corporation acting as executor, as administrator, as guardian, as conservator or as trustee of particular estates or trust funds had prior to the closing of the defendant corporation deposited cash funds of such estates or trusts in the savings department of the de-

fendant corporation and in other cases the estates or trust funds at the time of the appointment and qualification of the defendant corporation as such fiduciary included deposits in the savings department of the defendant corporation, which deposits at the date of the closing of the defendant corporation were held by the defendant corporation as such fiduciary. In some of these cases the defendant corporation is still acting as such fiduciary and in others the funds of the estate or trust have been transferred to a successor trustee or to the beneficiaries or owners. Question: Should the amounts of such deposit accounts in the savings department or any of them be paid by the receiver to the respective trustees and/or the beneficiaries or owners from the funds of the savings department in his hands in preference to general depositors in the savings department?" In the following discussion we shall refer to the defendant corporation as the "bank," and in its capacity as trustee, executor, etc., as the "bank-fiduciary."

The bank was authorized by its charter and by statute to act as fiduciary in the various capacities indicated in the stipulation. Special Laws, 1889, p. 842, § 9; Special Laws, 1917, p. 1127, § 2; General Statutes, § 3885.

A preliminary question relates to the right of the bank-fiduciary to deposit its trust funds in its own savings department. Our statute law prescribes how funds shall be invested by a fiduciary, "unless otherwise provided in the instrument creating the trust." General Statutes, § 4836. Among other investments therein prescribed are "bonds, stocks or other securities in which the savings banks in this State may be authorized by law to invest, or [the funds] may be deposited in savings banks incorporated by this State." We do not think the legislature intended by the words

"savings banks" as here used, to exclude "savings departments" in trust companies in this State. As we said in *Lippitt* v. *Thames Loan & Trust Co.*, 88 Conn. 185, 193, 90 Atl. 369, the corporation "was in reality operating a savings bank." The same solicitude has been shown by the legislature to protect depositors in the latter as in the former, and the statute provides that its deposits must be invested as savings-bank funds are invested. "All banks and trust companies maintaining a savings department, or soliciting or receiving deposits as savings, shall invest all such deposits so received, according to the requirements of the statutes concerning the investment of deposits in savings banks; and such investments shall be segregated and set apart and not mingled with other assets of such banks or trust companies, and shall be for the exclusive protection of the depositors in such savings department and shall not be liable for or used to pay any other obligation or liability of such bank or trust company until after the payment of all of the depositors in such savings department. The reserve fund required by section 3898 in the case of state banks and trust companies shall not apply to savings deposits under this section. This section shall in no way limit the right of any trust company to receive deposits and invest its funds upon such terms and conditions as are provided for in its charter, except as to deposits in its savings department as provided for in this section." General Statutes, § 3908. We have held that it was not improper or unlawful for an executor, a trust company authorized to receive deposits of trust funds, to deposit the funds of the estate in its own bank, if acting in good faith and with due regard to the protection of the funds. *Hayward* v. *Plant*, 98 Conn. 374, 391, 119 Atl. 341. This precise question has been decided in the affirmative in the State of New Hamp-

shire, and we are in accord with that view. *Tucker* v. *New Hampshire Trust Co.,* 69 N. H. 187, 44 Atl. 927.

The stipulated facts present a second question, viz.: whether we must differentiate those deposits which were already in the savings department when the bank became fiduciary and which it allowed to remain there, from those funds which it deposited there afterward.

The funds already deposited were within the provisions of our statute which permits a fiduciary to continue the investment as it came to him unless otherwise ordered by the Court of Probate or by the instrument creating the trust. General Statutes, § 4837. But this right must be exercised with prudence and the trustee will not be allowed to escape the responsibilities attaching to trustees generally for the safety of trust funds in his control. *Clark* v. *Beers,* 61 Conn. 87, 88, 23 Atl. 717; *Beardsley* v. *Bridgeport Protestant Orphan Asylum,* 76 Conn. 560, 564, 57 Atl. 165. The good faith and prudence of the depositor are not questioned upon this reservation. Both classes of deposits were kept with the savings department therefore at the discretion and upon the responsibility of the bank-fiduciary, its obligation to safeguard and account for both funds was the same, and for the purposes of our present inquiry they stand on the same footing.

In considering whether these deposits of trust funds are entitled to a preference over other deposits in the savings department, we should note the change of ownership which took place when these moneys were deposited. The money became at once the property of the savings department and was thereafter held by it not as the money of the bank-fiduciary but as its own. The funds, after deposit, did not remain impressed with the same trust which attached to them while in the hands of the bank-fiduciary, since it does

not appear from the stipulation that they were either wrongfully deposited or deposited under any special agreement that they should remain the specific property of the bank-fiduciary as such, and so claim a preference. 8 Thompson, Corporations (3d Ed.) p. 341, § 6211; 3 Michie, Banks & Banking (1931 Ed.) p. 270-273; 37 A. L. R. p. 120; 53 id. p. 564; *Shute* v. *Hinman,* 34 Ore. 578, 583, 56 Pac. 412, 58 id. 882, 47 L. R. A. 265. In the investment of these moneys by it, the savings department must conform, however, to the same requirements as savings banks, and these funds so invested are then held for the exclusive protection of the savings department depositors. It will thus be seen that while the depositors in the savings department have special rights in the fund, they are not the owners of it, the title being in the bank as such. Herein is a distinction between the rights of savings department depositors and depositors in our mutual savings banks wherein the banks act only as the agent and representative of the depositors and the assets of the banks are actually owned jointly by the depositors in proportion to their deposits. *Alexiou* v. *Bridgeport-Peoples' Savings Bank,* 110 Conn. 397, 400, 148 Atl. 374, and cases cited. These deposits by the bank-fiduciary were invested funds, and it is in relation to these funds that the present questions are asked. Any other "cash or funds temporarily uninvested," in the hands of the bank-fiduciary, are beyond the scope of this reservation, and are the subject of other statutory provisions. General Statutes, Cum. Sup. 1931, § 517a.

The defendant bank is a unit and all departments thereof are operated by it for its own profit, and all profits from all departments go to swell its general assets. The purpose of the law requiring the segregated investments in the savings department "was to

add to the protection of the savings department depositor and not to diminish that which he already had. He had, by the charter, a prior lien upon all the assets of the company. He had the right to share ratably in the avails in the hands of the receiver in a certain order. Neither privilege was taken from him by this statute. Another protectory privilege was added to these. If the investments in the savings department should not suffice to pay the savings department depositor in full, the unpaid balance of his deposit was placed on a parity with all other deposits, and entitled, on distribution, to share ratably in the order prescribed by § 3482 [Rev. 1902]. . . . His deposit stood in precisely the position of other deposits in its right to share in the distribution of the avails. It follows from what we have said that all depositors in the several savings departments are on a parity; that the said assets 'set aside for savings depositors' are to be applied to the payment ratably of all deposits in the several savings departments after paying the expenses of administration and taxes; that the avails remaining in the hands of the receiver are to be appropriated ratably to the payment of the balance of the savings department deposits and all other deposits; that the balance, if any, is to be distributed in accordance with § 3482 [Rev. 1902]." *Lippitt* v. *Thames Loan & Trust Co.,* 88 Conn. 185, 192, 193, 90 Atl. 369. This statute now reads as follows: "The avails of the property of any bank or trust company in the hands of a receiver or receivers shall be appropriated ratably to the payment of: (1) The charges and expenses of settling its affairs; (2) the circulating notes, if any; (3) all deposits; (4) all sums which have been subscribed and paid in for its stock by the state or the school fund; (5) all other liabilities; and the surplus shall be dis-

tributed among the stockholders." General Statutes, § 3935.

Save by some special arrangement, not present in the instant case, or because wrongfully made, deposits such as those which are the subject of the present reference, are on an equal footing in their relation to the savings department, and the depositors are entitled to have the segregated funds in that department applied ratably in proportion to the deposits. This right is founded upon the statute and is prior to "any other obligation or liability" whatever. Being statutory and in terms for the benefit of all the depositors without distinction, the rights of no one depositor can be discriminated against by giving a particular deposit a preference over the others. *Tucker* v. *New Hampshire Trust Co., supra; Bank Commissioners* v. *Security Trust Co.,* 70 N. H. 536, 544, 49 Atl. 113; 3 Michie, Banks & Banking (Ed. 1931) pp. 272, 275; 1 Morse, Banks & Banking (6th Ed.) p. 508-510, § 186; 56 A. L. R. p. 807. After this fund is exhausted, any balance of such deposits which has not been paid, becomes a general claim on all the assets of the bank and payable as the third item in the statute, § 3935, above quoted.

It is in this sense that effect is given to the charter amendment which provides that "all the capital stock, property, and estate of every kind belonging to said corporation shall constitute the security hereinbefore referred to, and shall be and stand charged with the fulfilment of any trusts, duties, and agreements authorized by this act of incorporation and the payment of deposits and trust funds as the first and prior lien thereon in case of any default by or the failure of said corporation, and they shall be taken and considered as sufficient and the only security to be required for

the faithful performance of its duties." Special Laws, 1889, Chap. 83, § 12, p. 842.

## D

BANKS, J. The Foley Steamship & Travel Agency applied to the Superior Court for an order directing the temporary receiver to return to it the sum of $635 deposited by it with the Trust Company on December 31st, 1931, after the close of regular banking hours.

The following facts are stipulated: The hour for closing the commercial department of the Trust Company under the rules of the Hartford Clearing House Association was 3 p. m., but it was its custom to receive funds for deposit and to pay out cash between the hours of 3 and 4 p. m., the funds so received not being credited to the customer's deposit account until the next business day. Cash received by the Trust Company was entered by its tellers on cash "proof sheets" with the name of the customer making the deposit opposite the amount of the deposit. Each day at 3 p. m. the tellers checked their proof sheets with the cash in their cash drawers, and started new proof sheets for the cash received after 3 p.. m. of that day and prior to 3 p. m. of the following business day. The cash received after 3 p. m. was placed in the cash drawer without separation from the cash that was in the drawer at 3 p. m., and cash was paid out from the drawer upon customers' checks after 3 p. m. The cash drawer with the cash therein at 4 p. m. was removed to the Trust Company's vault, and at the opening of business on the next business day was returned to the teller's desk. The Foley Agency, knowing of the practice of the Trust Company to receive deposits after 3 p. m. to be credited on the depositor's account on the next business day, deposited $635 in cash with the customary deposit slip between the hours of three and

four on the afternoon of December 31st, 1931, which was credited to its account on January 2d, 1932, and was not shown on the monthly statement of the Trust Company for the month of December. We are asked: "Should the amount of $635 delivered to the defendant corporation as aforesaid be treated as a general deposit or be repaid by the receiver?"

The Foley Agency claims that this deposit was in the nature of a special deposit, title to which did not pass to the Trust Company, and that it is therefore entitled to be paid the full amount of its deposit from the funds in the hands of the receiver. It does not appear from the facts stipulated that, when this deposit was made, the Trust Company was hopelessly insolvent to the knowledge of its officers, and there is no claim, such as might be made under those circumstances, that the receipt of the deposit was a fraud upon the depositor. The sole question is whether, upon the facts stipulated, the Trust Company became the debtor of the Foley Agency for the amount of its deposit, or held it as bailee or agent.

Deposits in a commercial bank ordinarly create the relation of debtor and creditor between the bank and the depositor. The money becomes the property of the bank, and if repaid it is done with the bank's funds and not those of the depositor. *Alexiou* v. *Bridgeport-Peoples' Savings Bank,* 110 Conn. 397, 399, 148 Atl. 374. "The title passes to the bank unless there is fraud, or the deposit is kept separate, with intent that the title shall not pass." 2 Morse, Banks & Banking (6th Ed.) § 629. A bank deposit is presumed to be a general deposit, creating this relationship of debtor and creditor, in the absence of an agreement to the contrary. 3 R. C. L. 517. Where it appears that the mutual intention and understanding of the parties was that title to the fund deposited should not pass to the

bank, the relationship established is not that of debtor and creditor, and the deposit in that case is spoken of as a special deposit, being held by the bank in accordance with the terms of the special agreement or understanding as to its disposition. In an early case in this State a special deposit was defined as follows: "A special deposit of money in a bank, I understand to be, where moneys (as bills in packages, or specie in boxes, for example), are entrusted to a bank, not to be used, but to be kept safely, and specifically returned." *Catlin* v. *Savings Bank of New Haven,* 7 Conn. 487, 494. Such a deposit of specie or other funds for safekeeping and return creates the relationship between the depositor and the bank of bailor and bailee. Where money is left with a bank with the understanding and agreement that it is to be devoted to some particular purpose, such as to be paid over to some third person on presentation of certain papers, it constitutes a special deposit, and is held by the bank as agent of the depositor. See *Turkington* v. *First National Bank,* 97 Conn. 303, 116 Atl. 610, and cases collected in annotation to *Fogg* v. *Tyler,* 39 L. R. A. (N.S.) 847 (109 Me. 109, 82 Atl. 1008). The distinctive feature of a special deposit is that the identical money is to be kept apart from the general funds of the bank so that it can be returned to the depositor or used for the specific purpose for which it was deposited. The intention of the parties controls, and in the absence of facts from which it can be found that the parties intended that the fund was deposited for safekeeping and return, or to be devoted to a specific purpose then agreed upon, it will be held to be a general deposit. 3 R. C. L. 516, 517.

This was an ordinary commercial deposit of funds to the general account of the depositor. It was not treated as a special deposit for it was immediately

commingled with the other funds of the bank in the teller's drawer. Clearly, it was the intention of the parties to create a general deposit with the resulting relationship of debtor and creditor, at least from the time that the deposit was entered upon the books of the bank. If there was a deposit at all it was a general deposit, since there was no agreement or understanding to the contrary. The contention of the Foley Agency seems to be that this money was simply left with the bank for safekeeping until the next business day, when, if the bank had opened, it would have assumed the nature of a general deposit, upon being entered upon the customer's deposit account. The claim involves the legal proposition that a bank deposit is made, and the relationship of debtor and creditor created between the bank and the depositor, not when the money is actually received, but when it is entered upon the books of the bank; that if the deposit is made after usual banking hours, and received by the bank and mingled with its other funds, but under its customary practice is not entered upon the depositor's account until the next business day, the relationship of debtor and creditor is not created until the second day, and if the bank does not then open for business is never created. This does not accord with the realities of the situation. The deposit is made when the cash is handed to the teller with the customary deposit slip, and by him placed in his drawer with other funds of the bank. The rights of the parties are then fixed, and do not depend upon when the deposit is entered upon the books of the bank or whether it is ever entered. As a matter of fact, these deposits were entered upon the teller's proof sheets at the time they were made. The fact that, as a matter of bookkeeping convenience, deposits made after three o'clock are treated as a part of the transactions of the next business day, does not

affect the legal relations of the parties created when the money was actually received. The mere fact that a deposit made after three o'clock was not credited upon the depositor's account until the following day would not justify an inference that the depositor did not intend to make, and the bank to receive, a deposit at the time the money was actually deposited, in the absence of other facts from which such inference could reasonably be drawn.

This precise question was passed upon in a well-considered opinion of the Circuit Court of Appeals of the Second Circuit in the case of *In re Ruskay* (1925) 5 Fed. (2d) 143. In that case a broker deposited checks in the Old Colony Trust Company after banking hours on February 21st. They were not credited to his account until the next banking day, February 23d. A petition in bankruptcy was filed against the broker on February 22d. The ultimate question in the case was one of preference, but its decision rested upon whether the deposit made after banking hours on February 21st, but not entered on the books of the bank until the next business day, immediately created between the bank and the broker the relationship of debtor and creditor. The court held that it did, and said (pp. 148, 150): "If it [the bank] does so receive a deposit the amount so received creates the relation of creditor and debtor as effectively as though the deposit was actually received before three o'clock whether the entry actually appears on the books of the bank on the day when it was received or whether the actual entry is postponed until the next day. . . . If the deposit was actually made on February 21st, the fact that it was accepted a few minutes after banking hours does not alter the obligation the bank assumed to the depositors. That obligation is no different from what it would have been if the deposit had been made

a few minutes before three o'clock." See also *Ex parte Clutton* (1850) Fonblanque's New Reports, 167; *Wasson* v. *Lamb,* 120 Ind. 514, 22 N. E. 729; 3 R. C. L. 531.

The Foley Agency cites *Sadler* v. *Belcher* (1843) 2 Moody & Robinson, 489, and *Philadelphia* v. *Eckels,* 98 Fed. 485. In the former case the bankers had, before the deposit was made, determined not to open for business the next day, and dealt with the deposit as property of the depositor, placing it in a separate place where it could not become mixed with the receipts of the day. In the latter the deposit was not mingled with other funds of the bank; the officers of the bank knew when the deposit was received that it was insolvent, and the court held that it would have been a fraud upon the depositor to accept the deposit. The amount deposited by the Foley Agency should be treated as a general deposit, and a part of the assets of the defendant in the hands of the receiver.

PER CURIAM. All the judges having concurred in the foregoing opinions except as noted, the question asked in division A of the stipulation is answered as follows: The makers of notes which represent loans made out of the funds of the savings department and the makers of notes which represent loans originally made out of the funds of the commercial department but which were thereafter transferred before maturity to the savings department for cash or other assets of equivalent value are not entitled to set off their deposits in either commercial or savings department; the makers of notes which represent loans made from funds of the commercial department but which were transferred before maturity to the savings department in order to compensate for depreciation in the market value of the investments held by that department are

entitled to set off their deposits in both the commercial and savings department. The first question asked in division B of the stipulation is answered "No;" the second is answered as follows: The claims here involved and which the Federal Reserve Bank is authorized to prosecute are not entitled to priority over those of depositors in the bank, but we leave for future decision, if necessary, the question whether they should be classified with "deposits" or with "other liabilities." The question asked in division C of the stipulation is answered "No." The question asked in division D of the stipulation is answered as follows: The amount deposited by the Foley Agency should be treated as a general deposit and a part of the assets of the defendant in the hands of the receiver.