THE UNITED STATES OF AMERICA, APPELLANT, v. R. W. HOLT, COMMISSIONER OF FINANCE OF THE STATE OF MISSOURI, ET AL., RESPONDENTS.—131 S. W. (2d) 59.

In the Springfield Court of Appeals. July 3, 1939.

26

*Harry C. Blanton,* United States Attorney, and *Marshall Craig,* Assistant United States Attorney for appellant.

*Hal H. McHaney* and *Moser, Marsalek & Dearing* for respondents.

FULBRIGHT, J.—This cause originated in the Circuit Court of Dunklin County, and is a suit in which plaintiff seeks, first, the allowance of its claim against the defendants as liquidating agents of a closed bank, and second, to have its claim given a preference. Trial by the court resulted in judgment for defendants and plaintiff appealed.

William A. Shy was acting postmaster of the Campbell postoffice from October 5, 1933, to April 1, 1935, during which time it was his practice to go daily to the First State Bank of Campbell and purchase a draft with the funds of the United States government' obtained in the usual course of business in the postoffice, payable to the postmaster in St. Louis. The First State Bank was the only bank in Campbell and made no charge for this service. On November 20, 1933, Mr. Shy went to the bank as was his custom for the purpose of securing a draft to send to the postmaster in St. Louis. He took with him the sum of $802.30, as evidenced by his memorandum. He arrived at the bank at approximately three o'clock during regular banking hours, while the bank was open for business, presented the money and the memorandum at the window and was being waited upon by Miss Davis, a bookkeeper, who was acting as teller. Miss Davis was counting the money when two armed men entered the bank and took the money that Mr. Shy had delivered, together with other money found in the bank. The draft was never issued, although repeated demands were made for it. Demand was also made on the bank for the money but no part of it was ever paid. The bank continued to carry on its business as a banking institution until November 6, 1934, at which time the Department of Finance of the State of Missouri took charge of it for the purpose of liquidation, and A. J. Langdon, Jr., was appointed Deputy Commissioner. Since that time he has been in charge of the business and property of the bank. No claim was filed by the

United States government within the period prescribed by the Missouri State laws governing the liquidation of banks. Agents of the government discussed the filing of a claim with Mr. Langdon but were advised that the statutory period had run. Thereafter, this suit was instituted.

The first question for us to determine is whether or not the trial court had jurisdiction. Defendants insist that by sections 5333-5339, Revised Statutes of Missouri, 1929, all claims against a bank in charge of the finance commissioner should be filed before the commissioner for allowance or rejection; that the commissioner is clothed with the sole authority and jurisdiction to pass upon such claims, except as otherwise provided in the statutes; that it is only after claims have been filed with the commissioner and determined by him and reported to the circuit court that the latter derives jurisdiction; and that the circuit court does not have original jurisdiction to entertain such suits or claims, the same being barred by the express provisions of section 5316. No claim was filed by plaintiff with the finance commissioner as required by the statute, and under such circumstances, the claim of a private person, firm or corporation against the First State Bank of Campbell, would be barred. The general rule is that Statutes of Limitation do not apply to the federal government, and while the statutes regulating, or prescribing the manner of liquidation of an insolvent bank may not be construed as Statutes of Limitation in the strictest sense, yet they do attempt to bar claims not filed with the commissioner of finance within the time prescribed. In passing upon the question before us, we must bear in mind that the right of priority of debts due the United States cannot be governed, impaired or superseded by state law. [United States v. Musselshell State Bank, 60 Fed. (2d) 157; United States ex rel. Ray v. Porter, 24 Fed. (2d) 139.] Moreover, our Supreme Court, in the case of State ex rel. Wyatt v. Cantley, 26 S. W. (2d) 976, sustained the jurisdiction of the trial court in a suit based upon a claim that had not been timely filed with the bank commissioner, and held that it was unnecessary to allege in the petition and prove at the trial that the claim upon which the suit was based was duly and timely filed with the bank commissioner, basing its holding on the fact that the State is a sovereign entity. The federal government is a sovereign power, and the reasoning in that case applies as well to the case at bar. We therefore hold that the trial court had jurisdiction.

The second issue to be determined, and the one decisive of this case, is the correctness of the court's ruling in sustaining defendants instruction B, which is as follows: ''At the close of plaintiff's evidence, the court finds that upon the pleadings and the evidence the plaintiff is not entitled to recover, and that judgment must be entered here in favor of the defendant.'' In passing upon this question plaintiff is given the benefit of all favorable evidence and every reasonable inference that may be drawn therefrom.

Plaintiff contends that on November 20, 1933, through its agent, William A. Shy, acting postmaster of the Campbell postoffice, it deposited in the First State Bank of Campbell the sum of $802.30. Defendant denies that such deposit was made. Usually, a deposit is complete when the money passes from the possession of the depositor into the hands and into the possession of the agent of the bank, if the transaction is performed within the bank and during banking hours. Possession on the part of an agent of the bank within the meaning of the rule implies acceptance, and it may equally well be said, that a deposit is complete when the money is delivered to and accepted by the agent of the bank, if within the bank and during banking hours. When funds are deposited in a bank as an ordinary deposit the relationship of debtor and creditor arises between the bank and depositor, and the money deposited becomes the property of the bank. [First State Bank v. Fidelity National Bank & Trust Co., 119 S. W. (2d) 348.] If a depositor has been consummated, and the relationship of debtor and creditor created, nothing short of payment on the part of the bank, or some act of the depositor himself, will suffice to exonerate it from the indebtedness it has assumed. The money in the instant case was delivered to the bank. Had it been accepted? Acceptance presupposes the right on the part of the agent to count and determine the amount of the money delivered to him, and until accepted, title to the money does not pass. If anything remains to be done in the way of inspecting or counting, there is no passing of title. [Buschow Lumber Co. v. Hines, 206 Mo. App. 681, 229 S. W. 451; Fairbank Co. v. Illinois Central Railroad Co., 167 Mo. App. 286, 149 S. W. 1154.]

The evidence upon which plaintiff bases its contention that a deposit was made was given by Mr. Shy and Miss Davis. Mr. Shy testified as follows:

"It was approximately 3 P. M. It was during the regular banking hours. The bank was open for customers. Miss Davis came to wait on me, and I presented my memorandum, upon which was written the amount of the draft and I simply had placed on the memo the names of W. Rufus Jackson as the man to receive the draft. I wouldn't say that I had that on there this particular day, for Miss Davis had written so many that she knew who to send it to, and I handed her the memo, together with the bundle of currency and the $2.30 and I stood in front of the window watching her count the money, and *she counted out the currency and laid it to one side within the bank enclosure, out of my sight, and then she looked down at the silver and apparently was looking at the silver and my memo when two strange men walked in,* and I was looking for her to start writing the draft at any second, and the men came in and staged a hold-up. I had laid the money in the window, I guess I pushed it pretty well under it, but it was my custom to push it under to her. *She had*

*counted it, and put it to one side. She moved it out of my vision where I couldn't see it.* She was behind the cage, which was an ordinary cage with bars running up, and a little ledge on which to place the money. I don't recall whether I put the silver all the way in. I think I did, but *I remember that when one of the robbers came by, this silver was well inside.* There were two robbers. They entered the bank, at the main door, and the first one came walking rapidly back toward where Miss Davis and I were transacting our business, and the other one stepped slightly to the right of the door and stopped, and then it seems, as I recall, that both of them at the same time pulled guns, and said, 'This is a hold-up.' ''

Miss Lula Davis testified in this regard as follows: ''I recall the happenings of the day of November 20, 1933, at the time Mr. Shy came in. As usual I waited on Mr. Shy through the window. He had placed the money inside the bars and I was counting it and I counted the currency and had it stacked to my right, but I had not yet got to the silver. He said he had two dollars and thirty something. I had not yet counted the silver. Mr. Shy had placed the money through the window. From the ledge outside he placed it inside. . . . The robbers were in the bank before I knew anything about them or hearing their orders, but I had not touched the silver when they walked to the window. One of the robbers came in the back. The one who came inside the cage took the money. . . .

''Q. Miss Davis, when money is brought in the bank in an amount as large as $800, such as Mr. Shy brought in on this occasion, was it customary for you to count it once or more than once? A. Ordinarily more than once.

''Q. Why was that done? A. Well, to verify the account. Naturally we would feel like we were surer.

''Q. You say you had counted the paper money and placed it in separate $100 piles or divisions? A. Yes, sir.

''Q. Was it necessary for you to count that again, according to your custom, or had it been counted twice? A. No, it hadn't been counted twice and ordinarily I would have counted it again.

''Q. When you discovered the robbers you had counted the currency once but not the silver at all? A. No, sir.

''Q. And in accepting it by the bank it would have been necessary to count the currency again and twice the silver? A. Yes, sir.

''Q. You wouldn't act in that capacity without counting the money and being sure how much it was, would you? A. No, sir.

''Q. It was never the custom to accept money without counting it, was it? A. Certainly not.''

The italicized portions of Mr. Shy's testimony do not bear out plaintiff's contention that he testified all the money had been counted. In the first instance, he testified that Miss Davis counted out the currency and laid it to one side out of his sight. Then she was *looking*

at the silver (not counting) and his memorandum when two strange men walked in. When he later said that she had counted *it* and put *it* to one side out of his vision, the only reasonable inference we can draw from this statement, when coupled with the former statement, is that he was referring to the currency and not including the coin. This inference is further strengthened by his statement that he remembered that when one of the robbers came by, the silver was well inside. Obviously, the coin was never out of Mr. Shy's sight, and had not been counted. There is no uncertainty about the testimony of Miss Davis. She had not only testified that she had not counted all the money, but that she had never touched the silver and that the custom was to count large sums of money, such as the one in question, twice. All the testimony shows that the currency had been counted only once, and there is no testimony that the silver was ever counted, but to the contrary. It is therefore our conclusion that the facts do not bring the transaction within the rule above stated. The money was not within the possession of the agent of the bank in the sence that the rule implies when the transaction between Mr. Shy and Miss Davis was intercepted by the hold-up. It had not been accepted. A deposit had not been made.

We have not been supplied with a precedent, and have been unable to find one. In the case of Bassett, Bank Commissioner v. City Bank and Trust Company, 115 Conn. 1, 81 A. L. A., 1488, the court said: "The deposit is made when the cash is handed to the teller with the customary deposit slip and by him placed in his drawer with other funds of the bank. The rights of the parties are then fixed." While we are not passing on the point of whether or not it is necessary to complete a deposit that the cash be placed in the teller's drawer with other funds of the bank, yet this case indicates that something else must be done other than merely handing the money to the teller with the customary deposit slip.

Plaintiff relies on the case of First National Bank v. Josefoff, 57 Ind. App. 320, 105 N. E. 175, which we do not think is in point. There the bank had placed a clerk, Mr. Picar, at a desk near a window and inside a part of the bank screened from the public and this clerk received during banking hours a deposit and informed the depositor who was not able to read or speak the English language that the bank was good for it. The clerk did not turn the money over to the bank. In that case the court said: "Even though it be conceded that the bank was not a fault with reference to the transaction in question, and that the appellee was also blameless, and that the loss was occasioned solely through the fault and misconduct of Picar, still the bank was responsible for Picar being placed in a situation where he was enabled to perpetrate the fraud. It is well settled that, where one of two innocent parties must suffer loss through the wrongful act of a third person, the loss must fall upon the one who placed such

third party in a position by means of which he was enabled to commit the wrong which occasioned the loss." In the case before us both parties are blameless, and so far as the record shows, neither party is responsible for the robbers staging the hold-up.

It is our conclusion that the trial court committed no error in sustaining the demurrer to the evidence. The judgment should be affirmed. It is so ordered. *Allen, P. J.*, and *Smith, J.*, concur.