**JOHN DEERE COMPANY, a Division of Deere & Company, a corporation, Plaintiff-Appellant,**

v.

**NYGARD EQUIPMENT, INC., Defendant-Appellee.**

Civ. No. 9010.

Supreme Court of North Dakota.

Dec. 31, 1974.

Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, for plaintiff and appellant.

Vogel, Vogel, Brantner & Kelly, Fargo, for defendant and appellee.

KNUDSON, Judge.

John Deere Company (hereafter Deere) appeals from a judgment obtained by Nygard Equipment, Inc. (hereafter Nygard) for $57,481.20, which included $25,000.00 for conversion, $15,000.00 for interest, $15,000.00 for punitive damages, and $2,481.20 for costs.

On July 7, 1971, Deere initiated an action by complaint wherein it was in essence asserted: that Deere and Nygard, on November 3, 1970, entered into a dealership agreement and that contemporaneously the parties entered into a security agreement whereby Nygard granted to Deere a security interest in the goods which were the subject of the dealership; that Nygard defaulted in the agreement by failing to pay to Deere the proceeds of sales to various customers, as required by the agreement; that the contract provides that if Nygard is in default Deere may declare all unpaid indebtedness to it immediately due and payable and that Deere was so declaring; that as of June 30, 1970, Nygard was indebted to Deere in the sum of $91,487.48 under the agreement (and $1,723.00 under another security agreement); that the security agreement provided that if default be made in the terms, Deere could take possession of the goods covered by the security agreement and sell them in the manner prescribed by law and by the security agreement; and that the property covered by the security agreement was in existence within the jurisdiction of the court and of the value of $92,500.00.

In the prayer for relief, Deere asked that it receive a judgment granting it immediate possession of the property and the right to pursue remedies provided for in the security agreement and as provided in the Uniform Commercial Code.

In Nygard's answer it was asserted: that Deere terminated the franchise agreement and in response thereto that Nygard offered to return all of the spare parts inventory under the laws governing machinery dealers in North Dakota; that the offer was rejected; that Nygard denies it owes $91,487.48; and that Nygard has total credits of $139,869.21 to offset any indebtedness claimed by Deere.

Nygard, by counterclaim, realleged a number of paragraphs of the answer, asserted that Deere maliciously, fraudulently, negligently and willfully terminated the franchise agreement between the parties and levied on said property by having the sheriff take possession of all of said property of which the value was far in excess of that claimed by Deere's complaint and specifically that the levy on all machinery was an illegal levy in that Deere had no right to take any of said items; alleged general damages in the amount of $137,360.00, and alleged exemplary damages against Deere for conversion of Nygard's property and for the malicious, fraudulent, negligent and willful manner in which its agreement was

terminated and in the taking of Nygard's property and interfering with Nygard's right to transact business.

The parties entered into a stipulation on August 15, 1973, parts of which are pertinent to the issues in this case:

"The amount of the indebtedness due John Deere as of the end of July of 1971 in the sum of $89,278.94 is subject to offsets for credits due Nygard Equipment by John Deere Company as of the end of July, 1971, in the total amount of $90,-280.38, exclusive of any credit due Nygard Equipment for its used machinery and equipment subsequently liquidated by John Deere."

"While this Stipulation sets out the foregoing agreed upon facts and figures, it is not intended to and it shall not be construed as an admission or acknowledgment by John Deere Company that John Deere knew or should reasonably have known or was required to know that its account and claim against Nygard Equipment was paid or could have been satisfied as of the end of July, 1971, or at anytime thereafter through the sale of the Nygard Equipment Used Machinery described in Paragraph 7 above, without the necessity of seizing the machines in July, 1971, and selling them in April of 1972.

"The agreements set forth in this Stipulation as to amounts due John Deere Company or credits due Nygard Equipment are the results of compromise and are not to be construed as an admission by either party that such amounts are true and correct for any purpose other than the compromise set forth in the Stipulation or that such amounts were known or should have been known to either of the parties hereto, provided, however, that the amount thereof may be offered into evidence by either party without further foundation.

"This Stipulation finally disposes of all claims between the parties, except the following:

"A. The Counterclaim of the defendant.

"B. The defendant's claim for interest on any sums due from the plaintiff.

"C. Nothing herein shall be construed as an acknowledgment or agreement by Nygard Equipment that John Deere Company had the legal right to sell Nygard Equipment used machinery in April of 1972 and there is expressly reserved to Nygard Equipment the right to attack the sale and how and when it was conducted. As reflected by Paragraph 7 above, this Stipulation does establish the amounts that John Deere Company realized as a result of conducting the sale of the Nygard used equipment in late April of 1972."

Nygard received a degree in agricultural engineering from North Dakota State University in 1966. Following graduation, he was employed by Deere in several capacities. In 1967 he assumed the job of territorial manager for Deere. Nygard wanted to stop traveling and start a business of his own close to his home town. He discussed the matter with Glenn Martin, Minneapolis Region Credit Manager for Deere, who suggested that the dealership in Enderlin, North Dakota, was for sale, and that the owner, Elwood Nelson, would be a good person with whom to associate. Nygard resigned from Deere and in June of 1968 Nygard Equipment, Inc. was organized. His original capital contribution to the corporation was $30,000.00, for which he secured a fifty percent interest, the other fifty percent interest being held by Nelson. Nelson also operated Deere dealerships in Milnor and Jamestown in addition to the Deere dealership at Enderlin.

In effect at the time of the institution of this lawsuit was a dealership agreement between Nygard Equipment, Inc. and John Deere Company, which was executed in November 1970 by James Nygard for Nygard Equipment, Inc. and by Gary Burau, Territory Manager, and Glenn Martin, Credit Manager, for John Deere Company. Con-

temporaneously, a security agreement between the same parties was executed giving to Deere a security interest in Nygard's inventory of Deere products, repair parts, and used machinery.

During the years 1968–1971 Mr. Nygard met his sales goals under the John Deere sales incentive plan and won trips to various resort areas. He also earned volume discounts throughout the period during which he was a John Deere dealer.

While a John Deere dealer, Nygard paid Deere to have a Deere field accountant supervise preparation of the monthly financial statement and year-to-date financial statements that Nygard was required to provide Deere. Nygard also employed its own fulltime bookkeeper and retained an auditor to conduct year-end audits and prepare annual financial statements and tax returns.

Deere provided Nygard with wholesale financing on a floor plan basis. On occasions in 1970 and 1971, Nygard sold floor-planned items and did not immediately transmit the sales proceeds to Deere, contrary to the strict provisions of the security agreement, although delay in transmittal never amounted to as much as thirty days.

On or about March 20, 1971, a Deere delegation, headed by Dale Persinger, Divisional Credit Manager under Mr. Martin, Gary Burau and Chuck Busse, the Deere field accountant who had been preparing the Nygard monthly statements during 1970 and early 1971, arrived at Enderlin to conduct an audit of Nygard assets and liabilities. These people did not make a physical count of the parts inventory. The audit placed the value of John Deere parts at $48,334.00. Accounts receivable were placed at $23,099.90, arrived at by taking Nygard's accounts receivable less a twenty-five percent reserve. This audit reported that from 1968 to March of 1971 Nygard had sustained a loss of $67,100.68.

Nygard denies this loss and asserts that its records showed only a loss of about $17,000.00, and that that loss occurred during the first three months of 1971. Nygard testified that in the implement business in North Dakota it was not uncommon to have an operating loss during the early months of the year prior to the commencement of Spring farming operations.

Nygard was first presented with the audit report at a meeting at Lisbon on March 30, 1971. At a later meeting on March 31, 1971, at the Fargo Implement Co., at which Elwood Nelson, Dale Persinger, Ed Johnson, Gary Burau and James Nygard were present, Nygard started to tell the Deere people of his plan to buy Elwood Nelson out of the dealership at Enderlin when he was informed by Persinger that was not the purpose of the meeting, but that the meeting was held for the purpose of telling Nygard that after a certain number of days there would be no more dealership at Enderlin. Nygard was presented a handwritten document prepared by Persinger which set out the decisions made by Deere. Pursuant to that document, Deere was to liquidate Nygard within sixty days; it was to receive seventy percent of Nygard's parts receipts as of the beginning of April, Nygard was to be placed on a c. o. d. basis; machinery sales not strictly for cash were to be run through Mr. Nelson's business at Milnor; and Nygard machinery sales agreements with farmers were to be subject to approval by Mr. Nelson, and if found to be unacceptable to him, the farmers were to be notified in order to attempt to have them sign statements cancelling orders by mutual consent.

The document also contained the statement, "It is agreed by all that Nygard Equipment is in financial trouble—no encouragement given to continue. This decision to be made by John Deere Co—Mpls Management." Mr. Nygard did not agree with any part of the document.

In April 1971, a Deere employee began an inventory of Nygard parts. He refused to inventory certain parts, claiming they were not returnable to Deere. A partial inventory of attachments was also made. Deere personnel thereafter started packing parts

in pallet boxes. They took no physical count of what was being packed. Nygard, however, conducted its own inventory of all Deere parts and attachments.

Nygard never received written notice that Deere was cancelling its franchise. The John Deere Dealer Group Insurance Trust, however, gave written notice that because Nygard's dealer contract had been terminated, Mr. Nygard and the firm's employees were no longer eligible for life insurance coverage through the Trust.

On June 9, 1971, Nygard sent Martin a letter reciting that Nygard expected to be paid for the return of parts, attachments, implements and machinery pursuant to the provisions of Sections 51–07–01 and 51–07–02 of the North Dakota Century Code.

On June 11, 1971, Martin, on behalf of Deere, replied by letter, that, "We have always taken the position the North Dakota Century Code as presently enacted does not apply to our dealers" and proposed a return schedule that differed from that of Sections 51–07–01 and 51–07–02.

At about the end of June 1971, Mr. Martin and Mr. Nygard met in Fargo. Mr. Nygard testified that at this meeting Mr. Martin told him that he didn't have the time or the money to fight Deere on the parts return issue and that he had better accept Deere's terms. Nygard also testified that Martin threatened to have him criminally prosecuted in connection with Nygard's sale of a repossessed tractor. Martin denied having made such statements or having so threatened.

At the trial it developed that the sale of the repossessed tractor was not a violation of law.

In July 1971, rejecting Nygard's claim for credit for return of parts, equipment and attachments under the North Dakota statute, and relying on its dealer agreement and security agreement, Deere seized selected parts and attachments, including Nygard's entire inventory of used machinery, under a claim and delivery action.

In August 1971, Nygard responded to Deere's complaint in the claim and delivery action with an answer and counterclaim as hereinbefore set forth.

In November 1971, Nygard delivered the parts and accessories which had been previously rejected by Deere to Fargo Implement, Deere's subsidiary corporation in Fargo, North Dakota, where the seized parts and attachments had been stored.

In April of 1972, John Deere sold the machinery that had been levied upon at private sale to area John Deere dealers by taking bids on each item. The amount recovered under the sale totalled $42,744.00. Mr. Nygard testified that, in his opinion, the market value of the machinery was $68,360.00.

On December 8, 1972, Judge Wallace E. Warner ruled at a pre-trial conference that Nygard parts, attachments and equipment were returnable to Deere under Section 51–07–01, N.D.C.C., and that Nygard was to be paid for them in accordance with the statute.[1]

1. 51–07–01. Retail implement or car dealer may recover price of articles upon discontinuance of contract by wholesaler or retail dealer.—Whenever any person, firm, or corporation engaged in the business of selling and retailing farm implements and repair parts for farm implements, or in the business of selling and retailing automobiles or trucks, or repair parts for automobiles or trucks, enters into a written contract evidenced by franchised agreement whereby such retailer agrees to maintain a stock of parts or complete or whole machines, or attachments with any wholesaler, manufacturer, or distributor of farm implements or machinery or repair parts therefor, or automobiles or trucks or repair parts therefor, and either such wholesaler, manufacturer, or distributor or the retailer desires to cancel or discontinue the contract, such wholesaler, manufacturer, or distributor, shall pay to such retailer unless the retailer should desire to keep such merchandise, a sum equal to one hundred per cent of the net cost of all current unused complete farm implements, machinery and attachments and automobiles and trucks including transportation charges which have been paid by such retailer, and eighty-five per cent of the current net prices on

On August 15, 1973, Deere and Nygard entered into the stipulation to which we have previously referred.

On December 12, 1973, the jury returned a verdict in favor of Nygard, and upon this verdict the court ordered judgment, together with costs and disbursements in the sum of $2,481.20, for a total judgment in favor of Nygard in the sum of $57,481.20. Deere appeals from the whole of the judgment.

In its brief on appeal, Deere summarized its argument as follows:

"The Trial Court committed prejudicial error in submitting the issue of wrongful termination of the Dealer Contract to the jury since all the evidence was that the Dealer Contract was properly terminated for breach according to its terms.

"John Deere is entitled to a Judgment of Dismissal because its taking possession of its collateral and selling of the collateral under the Security Agreement was fully authorized by Nygard's breach of the Security Agreement and the terms of the Security Agreement and the Uniform Commercial Code. The fact that more was realized from the sale of collateral than was due on the debt does not make the possession and sale wrongful.

"Gross errors were committed in the instructions to the jury in repetition, inaccuracies, non- and mis-instruction and the instructions in effect direct a verdict for Nygard.

"Punitive damages should not have been submitted to the jury because punitive damages are not available in a contract case. There was not sufficient evidence of oppression and malice to allow the jury to find punitive damages. There was no evidence that John Deere approved or ratified the acts of its employees who were not officers or directors, and all of the activities of John Deere were under its contracts and with the advice of attorneys for John Deere."

I.

■ Deere's first contention is that the trial court committed prejudicial error in submitting the issue of wrongful termination of the dealer contract to the jury. We do not agree.

The issue of termination of the agreement was not submitted to the jury. In fact, the trial court instructed the jury that "the evidence in this case has shown that

repair parts listed in current price list or catalogue which parts had previously been purchased from such wholesaler, manufacturer or distributor, and held by such retailer on the date of the cancellation or discontinuance of such contract. The wholesaler, manufacturer or distributor shall also pay such retailer a sum equal to 5 per cent of the current net price of all parts returned for the handling, packing and loading of such parts back to the wholesaler, manufacturer or distributor. Upon the payment of the sum equal to one hundred per cent of the net cost of such farm implements, machinery, and attachments and automobiles and trucks, plus transportation charges and eighty-five per cent of the current net prices on repair parts, plus five per cent handling and loading costs on repair parts only, plus freight charges which have been paid by the retailer, or automobiles or trucks, plus freight charges, or repair parts therefor, plus five per cent handling and loading costs on repair parts only, the title to such farm implements,

farm machinery, and repair parts, or automobiles, or trucks or parts therefor, shall pass to the manufacturer, wholesaler, or distributor making such payment, and such manufacturer, wholesaler, or distributor shall be entitled to the possession of such farm implements or automobiles or trucks, or repair parts therefor.

The provisions of this section relating to a retailer's right to cancel or discontinue a contract and receive payment for machines, attachments, and parts returned shall apply to all contracts now in effect which have no expiration date and are a continuing contract, and all other contracts entered into or renewed after July 1st, 1963. Any contract in force and effect on July 1st, 1963, which by its own terms will terminate on a date subsequent thereto shall be governed by the law as it existed prior to the 1963 amendment.

Chapter 329, section 1, S.L.1963, was in effect at all times pertinent to this opinion.

there were defaults in the contract and that the plaintiff John Deere Company was acting within the agreement between the parties in deciding that the contract had been breached." Deere argued that the dealer agreement provided for cancellation for withdrawal of a major stockholder, a disagreement or controversy between the stockholders, and for any default by the dealer under a security agreement. The evidence was undisputed that Mr. Nygard and Mr. Nelson each owned fifty percent of the stock in the dealership, that they were engaged in a lawsuit, and that Nygard bought Nelson's stock. The purchase by Mr. Nygard of Nelson's stock constituted a withdrawal of a major stockholder. The suit between the stockholders was a disagreement or controversy within the meaning of the dealer agreement. The withdrawal and the disagreement occurred after the decision to terminate the agreement had been made by Deere, and thus could not have been cause for termination.

This leaves only the ground of default under the security agreement. The evidence showed that in 1970 and 1971, contrary to the terms of the security agreement, Nygard sold floor-planned items and did not immediately transmit payment to Deere. Delays in transmittal never amounted to as much as thirty days and late payments were all accepted by Deere. The judge, in instructing that the agreement was properly terminated, took the issue of waiver of the right of "immediate" transmittal away from the jury, and in so doing gave Deere a more favorable instruction than that to which it was entitled.

What was submitted to the jury was not the termination of the agreement, but the manner of the termination and Deere's act of, and conduct in, seizing, retaining, and disposing of Nygard property. These matters were relevant in the jury's consideration of Nygard's claim for exemplary damages.

## II.

■ Deere contended that it was entitled to a judgment of dismissal because: (1) taking possession and selling of the collateral was authorized under the security agreement upon breach of the agreement by Nygard and by the Uniform Commercial Code and (2) the fact that more was realized from the sale of collateral than was due on the debt did not make the possession and sale wrongful.

Briefly stated, Deere's argument was that the security agreement provided that the indebtedness was accelerated upon default; Section 41–09–49, N.D.C.C., provides that "a secured party has, on default, the right to take possession of the collateral"; that the security agreement authorized Deere to "take possession of any or all goods and trade-ins"; that Section 41–09–50, N.D.C.C., provides that "a secured party after default may sell, lease or otherwise dispose of any or all of the collateral"; and that the North Dakota Uniform Commercial Code does not limit the quantity of collateral a secured party can take into his possession (Section 41–09–50, N.D.C.C., provides that in case of possession and disposition of collateral in excess of the debt, "the secured party must account to the debtor for any surplus"); that Deere's initial possession of the collateral through a duly filed claim and delivery action was lawful; that, as a matter of law, Deere's taking possession and sale of the collateral was lawful; and therefore no conversion occurred and Deere was entitled to a judgment dismissing Nygard's counterclaim.

Assuming, arguendo, that Nygard's failure to "immediately" transmit payment to Deere upon the sale of some floor-planned items was a default that set in motion the creditors' rights provided in the North Dakota Uniform Commercial Code and in the parties' security agreement, this argument misses the mark. Both the North Dakota Uniform Commercial Code provisions and the security agreement entered into by the

parties are premised upon the existence of an underlying debt, which the jury could have found absent in this case because of Deere's refusal to recognize the application of Sections 51–07–01 and 51–07–02, N.D. C.C.

The purpose of the security agreement was to provide Deere with security for payment of any obligation owing from Nygard to Deere. When Deere instituted its suit against Nygard and seized Nygard's used machinery, however, there was no underlying debt owing from Nygard to Deere. Deere, in fact, owed money to Nygard. As previously noted, the parties stipulated that, as of the end of July 1971, the amount owing from Nygard to Deere was $89,278.94, which was subject to offsets for credits due Nygard by Deere in the amount of $90,280.38. Thus, had Deere credited Nygard for the return of parts as required by Section 51–07–01, N.D.C.C., upon termination of the dealership agreement, it would have been apparent that Deere owed Nygard money. Although Deere may not have been able, until the balance of accounts was finally struck, to determine the actual value of the parts, it was for the jury to determine whether Deere's conduct was reasonable in seizing the used machinery, keeping in mind that the right to seize collateral provided by a security agreement is inoperative when there is no debt to be satisfied.

Deere's assertion that:

"At the time of the private sale under the Uniform Commercial Code of the used machinery by John Deere, John Deere did not know whether there was going to be a surplus or a loss on the Nygard account (tr. 165). This sale took place in April, 1972. It was not determined until December of 1972, eight months later, that John Deere would have to credit Nygard with used parts under the statute rather than under the Dealer Agreement."

is untenable. It was within Deere's power, not only at the time of the sale of the seized machinery, but at the time it instituted suit and seized the used machinery and at the time that it terminated the dealership agreement, as well, to determine whether Nygard owed Deere when all credits were considered. Deere was as much required to accept for return Nygard's parts inventory and to credit Nygard with its value in accordance with the provisions of Section 51–07–01, N.D.C.C., in June of 1971 as it was in December of 1972, when ordered by Judge Warner.

Deere's seizure, detention, and sale of collateral much in excess of the debt owed it by Nygard, through its claim and delivery action, were factors to be considered by the jury in determining whether a conversion occurred and what damages were sustained and accordingly Deere was not entitled to a judgment dismissing Nygard's counterclaim.

Chapter 32–07, N.D.C.C., entitled "Claim and Delivery," provides in Section 32–07–12 that if the jury finds against the plaintiff the defendant shall recover damages for the taking and detention of his property.

In addition to being liable for damages under Section 32–07–12, N.D.C.C., Deere is liable for conversion of Nygard's property.

Deere argues in its brief that:

"The initial possession of the collateral secured by John Deere was lawful. Subsequent events or subsequent knowledge cannot turn the initial lawful possession into an illegal act or a conversion."

Deere's argument ignores the fact that "the gist of a conversion is not the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property he is entitled to possess." 18 Am. Jur.2d Conversion § 25 (1965). "A wrongful seizure or sale of property under legal process constitutes a conversion." 18 Am. Jur.2d Conversion § 27 (1965). Nor does Deere's belief that the parts inventory was returnable only under its dealer agreement, rather than under Section 51–07–01, N.D. C.C., improve its position.

"Generally, the motive with which the defendant acts is immaterial in an action for conversion. Liability for a conversion is not necessarily precluded by the fact that the defendant acts without ill will or malice or by the fact that he acted in good faith, sincerely, innocently, inadvertently, by mistake, or in ignorance of the plaintiff's interest in the property or of the value thereof. An action for conversion does not rest on the knowledge or intent of the defendant. Thus, the defendant is answerable for the conversion, no matter how good his intentions were, or how careful he has been, or how apparently well founded was his belief that his tortious act was right." 18 Am.Jur.2d Conversion § 7 (1965).

■ Having wrongfully deprived Nygard of its property, Deere is answerable in damages for the value of the property, under Section 32–03–23, N.D.C.C., which provides:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"1. The value of the property at the time of the conversion, with the interest from that time; or

"2. When the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"3. A fair compensation for the time and money properly expended in pursuit of the property."

An alternative measure of damages in an action such as this is the value of the property and damages for the taking and detention of such property, under Section 32–07–12, N.D.C.C., which provides:

"In an action for the recovery of specific personal property, the jury shall find by its verdict the facts, as the case may be, as follows:

. . . . .

"3. In case it finds against the plaintiff and the property has been delivered to him, and the defendant in his answer claims a return of the property, it shall find the value thereof . . . at the time of the taking, and it also shall assess the damages, if any are claimed in the answer, which the defendant has sustained by reason of the taking and detention of such property;

. . . . ."

■ The right to the property, or its value, and the right to recover damages for the wrongful taking and detention thereof, are separate rights. Nichols & Shepard Co. v. Paulson, 10 N.D. 440, 87 N.W. 977 (1901).

The jury found as damages for wrongful conversion the sum of $25,000.00. There is support for such a finding in the record, as Mr. Nygard testified that the market value of the machinery seized and sold was $68,-360.00, although the amount recovered at the sale was $42,744.00. Nygard was also entitled to recover damages for loss sustained through detention of its property and exemplary damages, as will be hereinafter discussed.

### III.

Deere next contended that gross errors were committed in the instruction to the jury in repetition, inaccuracies, non- and mis-instruction and that the instructions in effect directed a verdict for Nygard. Deere's argument on the matter of the court's instructions to the jury was divided into three headings, to wit:

"A. The jury instructions on repossession and sale of the collateral

"B. Misinstruction on the North Dakota Dealer Parts Return Statute

"C. The Court's jury instructions on interest."

We will discuss Deere's contentions with respect to the court's instructions in the order in which Deere presented them.

A. The jury instructions on repossession and sale of the collateral.

■ Deere's first contention is that

". . . the Court incorrectly states that Nygard's counterclaim alleges that Deere failed to credit Nygard with the value of parts, equipment and attachments as required by law in the sum of $40,000.00. Nygard's claim against Deere was not for failure to credit for the value of parts, equipment and attachments. The returned parts question was fully settled by Judge Warner's Pre-Trial Order and the Stipulation. Nygard's claim against Deere was that John Deere had no right to take possession of the collateral and had no right to sell the collateral because the debt from Nygard to Deere was extinguished by other credits due [Nygard from Deere]."

Nygard did allege, however, that Deere failed to credit it with the value of parts, equipment and attachments as required by law, and its claim against Deere arose out of Deere's failure to credit Nygard for return of parts, equipment and attachments as required by law. The returned parts question was, as Deere contended, settled by Judge Warner's pre-trial order and the stipulation, but Nygard's claim for damages sustained because of Deere's seizure of its property, which was related to Deere's failure to credit Nygard as required by law at the time it terminated the dealer agreement and seized the property under its claim and delivery action, still remained in issue.

Deere next contended that

"The jury was given a binding instruction that evidence showed there were defaults in the contract. John Deere was within the agreement deciding that the contract had been breached (Tr. 247). The Court continued (Tr. 251) that John Deere had on default the right to take possession of the collateral by claim and delivery, the right to sell the collateral and account to Nygard for any surplus.

"At the same time the Court instructs the jury in a manner that directs a verdict for the defendant. . . . "

The contention was that, because a stipulation between the parties providing that there was due to Nygard from Deere some $90,280.38, which was in excess of the $89,278.94 due from Nygard to Deere, the following instructions directed a verdict on the issue of liability in favor of Nygard:

". . . If you find from the evidence that the returnable farm implements, machinery, attachments, and repair parts (credited in accordance with North Dakota law) were sufficient to satisfy the indebtedness due from Nygard Equipment, Inc. to John Deere Company, then the underlying debt would be satisfied and John Deere Company would not be entitled to rely on the security agreement to justify the seizure of the Nygard Equipment, Inc. used machinery. This is so even if John Deere Company was ignorant of the fact that its debt could be satisfied by giving proper credit for the returnable farm implements, machinery, attachments, and repair parts, or mistakenly believed that it was not obligated to give such credit for returnable property in accordance with the North Dakota statute."

". . . Should you determine that the obligation or debt due from Nygard Equipment, Inc. to John Deere Company could be satisfied by the return by Nygard Equipment, Inc. of the repair parts, farm machinery, implements, and attachments to John Deere Company under the North Dakota law, then you are instructed that the seizure of the used machinery was wrongful . . . ."

We do not find the instructions to be contradictory or conflicting, nor do we find that a verdict was directed in favor of Nygard. The first instruction quoted above was preceded by the following sentence:

"You are instructed that the purpose of the security agreement was to provide protection for John Deere Company for

the underlying debt owed from Nygard Equipment, Inc. to John Deere Company."

Thus, it is clear that the court's instructions on Deere's right to take possession of and sell the collateral were operative only if the jury found that there was an underlying debt owing from Nygard to Deere. Such a finding was not precluded because the stipulation between the parties was before the jury. The stipulation provided, in paragraphs 12 and 13, as follows:

"12. While this Stipulation sets out the foregoing agreed upon facts and figures, it is not intended to and it shall not be construed as an admission or acknowledgment by John Deere Company that John Deere knew or should reasonably have known or was required to know that its account and claim against Nygard Equipment was paid or could have been satisfied as of the end of July, 1971, or at anytime thereafter through the sale of the Nygard Equipment Used Machinery described in Paragraph 7 above, without the necessity of seizing the machines in July, 1971, and selling them in April of 1972.

"13. The agreements set forth in this Stipulation as to amounts due John Deere Company or credits due Nygard Equipment are the results of compromise and are not to be construed as an admission by either party that such amounts are true and correct for any purpose other than the compromise set forth in the Stipulation or that such amounts were known or should have been known to either of the parties hereto, provided, however, that the amount thereof may be offered into evidence by either party without further foundation."

The jury, therefore, was required to arrive at an independent conclusion as to whether there was an underlying debt owing from Nygard to Deere in excess of that which could have been discharged without resorting to the used machinery. The stipulation was material in determining this issue but

we cannot say that the instruction constituted a directed verdict in favor of Nygard.

The second paragraph of instructions quoted above and contended by Deere to be erroneous is but a part of an instruction that deals, not with liability, but with damages. The instruction goes on to state what is recoverable by Nygard if the jury should find in favor of Nygard. The instruction merely reflects the provisions of Section 32–07–12, N.D.C.C., and the fact that the right to recover the reasonable value of the property and the right to recover damages for the taking and detention of the property are separate rights, as this court held in Nichols & Shepard Co. v. Paulson, *supra.*

Deere next argued that the following language in the court's instructions also directed a verdict for Nygard:

". . . if you find by a fair preponderance of the evidence that the plaintiff properly conducted the repossession of the machinery and personal property set forth in the evidence within the laws of the state *and* that the defendant suffered no damages, by reason thereof *and* that the defendant is not entitled to recover any punitive damages, then you must find in favor of the plaintiff for a dismissal of the action." [Emphasis supplied by Deere.]

The language quoted by Deere is but a part of an instruction on the burden of proof. The quoted language was preceded in the court's instructions by the following:

"If you find, by a fair preponderance of the evidence that the plaintiff did not conduct the repossession of the machinery and personal property connected with the Nygard Equipment, Inc. business, within the contract and according to the state laws, and that the defendant was thereby damaged by reason of any wrongful taking and conversion of such personal property, then the jury must turn its attention to determining the amount of damages, if any, the defendant Nygard Equipment suffered thereby. On the other hand,"

The language quoted by Deere is succeeded by the following:

"The defendant has the burden of proving to your satisfaction by a fair preponderance of the evidence that Nygard Equipment, Inc. is entitled to recover damages in this case. That there was a wrongful conversion, that there was malice, fraud or oppression on the part of the plaintiff, the amount of the damages they claim to recover, and that they are entitled to recover from the evidence offered and received in the case."

Thus, when the language relied upon by Deere is placed in context it is clear that the court was merely instructing the jury that, in order to recover, Nygard was required to prove each of its claims by a preponderance of the evidence. When the instructions on the burden of proof are considered in their entirety, the use of the word "and" does not, as Deere contends, improperly link the question of liability to the question of damages.

Next, Deere contends that the following language confused the issue of liability with the issue of damage:

"Should you, however, find that the defendant Nygard Equipment is not entitled to recover any damages on any cause of action in this case, then you will find another form of verdict which will substantially read: We, the jury, empanelled and sworn to try the above entitled action, find in favor of the plaintiff John Deere Co. for a dismissal of this case."

The court was merely informing the jury that two forms of verdict were being submitted and which one was used depended upon in whose favor the jury found. The court instructed:

"Two forms will be submitted to you in this case. One, shall you find that the defendant Nygard Equipment is entitled to recover damages for wrongful conversion and/or for punitive damages in this case, your verdict will substantially read: . . ."

"Should you, however, find that the defendant Nygard Equipment is not entitled to recover any damages on any cause of action in this case, then you will find another form of verdict which will substantially read: . . . ."

We do not find that the language, cited by Deere as erroneous, when considered in context, confused the issue of liability with the issue of damage. If the defendant in a case is not entitled to recover any damages on any part of the counterclaim, the plaintiff is entitled to a dismissal of the counterclaim.

B. Misinstruction on the North Dakota Dealer Parts Return Statute.

Deere argued that there was no issue at the trial on whether the North Dakota Dealer Parts Return Statute, Section 51–07–01, N.D.C.C., applied or on what credit Nygard would receive for returned parts, apparently on the ground that this had been settled by Judge Warner's pre-trial order and the stipulation between the parties. Whether the law applied was not an issue at the trial. Deere's actions after it erroneously refused to apply the law (its seizure and sale of the collateral) were the central issues in the case.

 Deere argued that repetitions in the instructions on the parts return statute constituted prejudicial overemphasis in a very sensitive area. We do not find that there was an undue overemphasis in this area, especially in view of the importance of Deere's assertion that the statute did not apply, giving rise, as it did, to Deere's seizure and sale of Nygard's property, which precipitated the counterclaim. Even if repetitive references to the parts return statute did give it undue prominence, such overemphasis, standing alone, is not ground for reversal. See Johanson v. Nash Finch Co., 216 N.W.2d 271 (N.D.1974).

 Deere also points out that the instructions did not set out the terms of the parts return statute. Deere could have re-

quested that the statute be quoted verbatim. This it did not do. In Teegarden v. Dahl, 138 N.W.2d 668 (N.D.1965), we said, at page 685:

> "It is the settled law in this State that:
>
> " 'In the absence of a request for an appropriate instruction the failure of a trial court to instruct the jury does not constitute prejudicial error. In such case failure to instruct can be urged as error only if in the light of the evidence the nondirection constitutes misdirection.' Umphrey v. Deery, supra [78 N.D. 211, 48 N.W.2d 897], and numerous cases cited therein."

Consistent with our position in *Teegarden*, we hold that failure to set out the terms of the statute was not misdirection.

### C. The Court's jury instructions on interest.

▉ Deere argued that the jury's award of $15,000 was contrary to the law and evidence and that the court's instructions on interest confused and misled the jury. Deere's discussion on this point centered on interest on a damage award, rather than interest as an element of damages, which is what the jury awarded. There was evidence that Nygard owed approximately $70,000, at interest rates of approximately eight and one-half percent, and that machinery valued by Nygard at $68,360 was seized and detained from Nygard for approximately two and one-half years before the verdict was rendered. Section 32–07–12, N.D.C.C., provides that the jury shall assess damages "which the defendant has sustained by reason of the taking and detention of such property." By seizing Nygard's used machinery, Deere deprived it of the wherewithal to repay the loans.

From the foregoing evidence, we believe that the jury could have found that the interest expense sustained by Nygard as an item of damage was $15,000, and because we consider the evidence in the light most favorable to the verdict we sustain that award.

> "In reviewing the sufficiency of the evidence on appeal from the judgment and from an order denying a motion for judgment notwithstanding the verdict or for a new trial, this court will view the evidence in the light most favorable to the verdict." Syllabus 6, Watkins Products, Inc. v. Stadel, 214 N.W.2d 368 (N.D. 1973).

### IV.

Finally, Deere contended that the issue of punitive damages should not have been submitted to the jury because: (1) punitive damages are not available in a contract case; (2) there was not sufficient evidence of oppression and malice; (3) there was no evidence that Deere approved or ratified the acts of its employees who were not officers or directors; and (4) all of Deere's activities were under its contracts and with the advice of attorneys for Deere.

▉ This was not a contract action. Nygard's claim was not for breach of contract, but for conversion (Deere's wrongful seizure and sale of property belonging to Nygard). Since this was not a contract action, punitive damages were not precluded by statutory provisions or judicial decisions holding that punitive damages are not available in contract actions.

Section 32–03–07, N.D.C.C., provides:

> "In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

Exemplary damages are recoverable under this statute in conversion actions.

> "Exemplary damages may be awarded for conversion when the wrongdoer has been oppressive or malicious. Lamoreaux v. Randall, 53 N.D. 697, 208 N.W. 104."

Remmick v. Mills, 165 N.W.2d 61, 69 (N.D.1968).

To support an award of exemplary damages, the jury must find oppression, fraud, or malice, actual or presumed.

"Our review of the facts is limited to a consideration of whether there is substantial evidence to sustain the verdict; if there is such evidence, we are bound by the verdict." Syllabus 4, Watkins Products, Inc. v. Stadel, 214 N.W.2d 368 (N.D. 1973).

 The jury could have found that the Deere audit of Nygard's assets and liabilities in March of 1971, with no physical count of the parts inventory, was fraudulent. The jury could have found that the demands of Deere at the meeting on March 31, 1971, at Fargo Implement Co. were malicious and oppressive. The jury could have found that Deere's rejection of Nygard's offer to return parts, machinery, and attachments in accordance with Section 51–07–01, N.D.C.C., was malicious and oppressive. The jury could have found that Deere's act of leaving the returned parts in pallet boxes, uncounted, for a period of nine months was indicative of an indifferent, calloused attitude on the part of Deere, which showed no concern for the rights of Nygard. Mr. Nygard testified that Mr. Martin told him he didn't have the time or the money to fight Deere on the parts return issue and that he had better accept Deere's terms. Mr. Nygard also testified that Mr. Martin had threatened to have him criminally prosecuted in connection with the sale of a repossessed tractor. Although Mr. Nygard's testimony was disputed by Mr. Martin, it was evidence of oppression if the jury chose to believe it. The credibility of witnesses and the weight to be given to their testimony are questions of fact for the jury to determine. Lembke v. Unke, 171 N.W.2d 837 (N.D.1969); Sprenger v. Sprenger, 146 N.W.2d 36 (N.D.1966).

Deere asserts that punitive damages are not allowable where an attachment or wrongful act is done under a bona fide claim of right and that, in a conversion action, punitive damages will not be awarded where there is a mistaken assertion of a supposed right.

In view of the evidence of oppression, fraud, and malice that has been previously set forth, however, we do not find it necessary to determine whether an attachment or other wrongful act done under a bona fide claim of right or a conversion under a mistaken assertion of a supposed right, standing alone, would support an award of punitive damages.

Deere argues that, since it is a corporation and none of the persons involved with Nygard were officers or directors of the corporation, punitive damages were improperly allowed, as there was no evidence that Deere knew of, authorized or ratified any of the actions of the employees. Citing Rickbeil v. Grafton Deaconess Hospital, 74 N.D. 525, 23 N.W.2d 247 (1946), Deere asserts that an employer is not responsible for punitive damages unless the employer participated in the wrongful act or approved of the wrongful act of the employee either before or after its commission, and the authorization or ratification must be affirmatively shown.

 We conclude from the record, however, that Martin's acts were authorized by Deere. Martin was a highly placed executive in the Deere corporation. As Minneapolis Region Credit Manager, he was responsible for an area comprised of four States and large parts of three others. He was authorized to enter into or terminate dealership agreements on behalf of Deere. Inherent in this authority was the authority to do whatever he judged to be necessary to effect dealership agreements or effect terminations of dealership agreements. In a large corporate enterprise such as Deere, an executive in a position such as Martin's is much more important to franchisees and possible franchisees than officers or directors of the corporation. In view of Martin's authority and responsibility, his act,

even though he was neither an officer nor a director of the corporation, was the act of Deere. Deere, therefore, was properly assessed exemplary damages under the circumstances of this case.

■ Deere asserted that punitive damages should not have been awarded since Deere relied on the advice of counsel. At the trial, however, Deere presented no evidence that Martin had ever presented counsel with a specific question concerning the applicability of the parts return statute, either in general or in the instant case. Deere presented no written opinion from counsel on the applicability of the parts return statute. Deere did not submit the name of any staff counsel on whose advice Deere purported to rely. From the evidence presented at the trial, the jury could have concluded that Martin did not seek the advice of counsel as to the application of the parts return statute in this case until after the seizure of Nygard's property in the claim and delivery action and after Nygard asserted its counterclaim.

Thus, it becomes unnecessary to determine whether, had Deere secured the advice of counsel as to the application of the parts return statute prior to its seizure of Nygard's property, an award of exemplary damages would have been precluded.

■ Deere also complains of repetition of the words "punitive damages" or "exemplary damages" and "malicious, fraudulent and oppressive," contending that the repetition unduly overemphasized these issues. The repetition occurred because the trial court read Deere's requested instructions, which were similar to instructions requested by Nygard, a copy of which had been served upon Deere. The words were contained in additional requested instructions that Deere submitted only after the trial court denied Deere's motion for a directed verdict. In light of Deere's shared responsibility for the use of these terms, we do not find that their repetition unduly overemphasized these issues.

For reasons stated in this opinion, the judgment of the trial court is affirmed.

ERICKSTAD, C. J., and PAULSON and VOGEL, JJ., concur.

JOHNSON, Judge (dissenting in part).

There are certain aspects of the majority opinion with which I have difficulty. The manner in which it deals with the seizure of the inventory is troubling in several respects. It would not necessarily follow that the obligation for payment of the inventory under the statute (§ 51–07–01, N.D.C.C.) would extinguish the obligation due John Deere, particularly where John Deere had not yet taken possession of the parts and other items. Such items might be set up in a judicial proceeding as a setoff or counterclaim to the claim of John Deere. However, the existence of an obligation or debt on the part of John Deere does not extinguish an obligation or debt on the part of Nygard. This is particularly true where one of the obligations is unliquidated, uncertain as to exact amount, and contingent on recovery of the inventory. See Lane v. Volunteer Co-operative Bank, 307 Mass. 508, 30 N.E.2d 821 (1940); Bassett v. City Bank & Trust Co., 115 Conn. 1, 160 A. 60 (1932); Rule 13 N.D.R.Civ.P.

John Deere, operating under a valid security interest, would be entitled to repossession of the collateral upon default. It would be obligated to account to Nygard for any surplus upon sale of the collateral. §§ 41–09–49 and 41–09–50, N.D.C.C. A seizure or repossession of collateral under these circumstances would not constitute a conversion. Under the Uniform Commercial Code, a secured party does not repossess collateral in excess of that needed to satisfy the obligation at his peril. It is often difficult to determine the value of collateral under a repossession sale. There may be circumstances where the amount of collateral repossessed is excessive in view of the debt to be satisfied, but the Commercial Code has no specific restrictions.

It might be reasonably argued that the obligations arising under the statute upon termination of the franchise agreement constituted a remedy which should be given priority. When Nygard submitted its claim under the statute for parts and equipment inventory, such a claim could have been resolved previous to seizure of all the collateral by John Deere. It might also be argued that John Deere's actions in retaining excessive collateral and not making a prompt disposition of such collateral constituted a conversion as to the excess. However, the case was not submitted on this basis below.